THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEFAN A. MOORE, Defendant-Appellant.

Fourth District   No. 4—92—1005

Opinion filed September 16, 1993.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Beth McGann, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Defendant Stefan Moore was charged in the circuit court of Champaign County with one count of aggravated criminal sexual abuse (Ill. Rev. Stat. 1991, ch. 38, par. 12—16(c)(1)(i)) and three counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1)). The charges stemmed from acts allegedly committed by defendant upon his niece, L.M., with whose family he was living when the alleged incidents occurred.

Defendant was accused of placing his penis in L.M.'s vagina during the summer of 1990 or 1991 and placing it on her vagina during that same time period. He was also accused of placing his finger in L.M.'s vagina on January 30, 1992, and of intentionally fondling her vagina for his own sexual arousal on that date.

On September 15, 1992, the case proceeded to a jury trial *in absentia*. Prior to the trial, the court held a hearing under section 115—10 of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 115—10) to determine whether certain statements by L.M. would be admissible at trial as an exception to the hearsay rule. At that hearing, the following testimony was given.

Tracy Jobe, a police officer and investigator for the City of Champaign, testified that she interviewed seven-year-old L.M. on February 1, 1992, at her home. Jobe has approximately six years' experience interviewing children. She was accompanied by William Gordon, an investigator with the Illinois Department of Children and Family Services (DCFS). When asked what had happened with defendant, L.M. said that he had put his finger in her private part. She had been asleep in her bedroom and defendant came into her room. When asked to show where her private part was, L.M. pointed to her vaginal area. When she told defendant to stop, he did and left the room. When asked whether this had happened before, L.M. said it happened one to two years ago. In trying to establish a time frame, Jobe asked if it was during school or when school was out. L.M. remembered it happened during the time her brother was in summer school. In talking to L.M.'s parents, Jobe was able to establish when the incident happened. Jobe then asked what happened, and L.M. said they were in the living room watching television when defendant grabbed her hand and took her into her brother J.M.'s room, put her on the mat-

tress, took her clothes off, took his pants and underpants off, and put his private part on her private part. L.M. said defendant stopped when he felt white goo coming out of him. Defendant then wiped L.M. and himself with a washcloth and left the room. L.M. told her brother about this and he was supposed to tell their stepmother, but he forgot.

Jobe testified L.M.'s demeanor during the interview was very calm. Toward the middle of the interview she became restless, toying with her clothing, and appeared to be anxious to end the interview. Jobe further testified L.M. answered her questions in a direct manner and that she did not suggest any answers to L.M. The only time L.M. was inconsistent was when Jobe asked her how long the incident in 1990 or 1991 lasted. L.M. said one hour and then changed it to a minute.

William Gordon, a child welfare specialist for DCFS, testified he accompanied Jobe to the interview with L.M. At that time he was a child protective investigator for DCFS. He and Jobe used open-ended questions, and no answers were suggested to L.M. The only inconsistency was in estimating the length of time of the 1990 incident. When L.M. said the earlier incident lasted one hour, he pointed out that two comedy shows last one hour. She then realized how long one hour was and stated it lasted a minute.

Debbie Moore, stepmother of L.M. and J.M., testified that defendant lived with the family from February through August 1990, and from December 1991 to late January 1992. During the 1990 visit, defendant shared a bedroom with J.M. She and her husband both worked. One condition of defendant's continued residence with them was that he would baby-sit for the children while the parents were at work. The morning of January 31, 1992, they were busy with breakfast and getting ready for school and day care, and she did not have an opportunity to talk to L.M. or J.M. Defendant was sleeping on the couch, where he usually slept. When she arrived home from work that evening, J.M. and L.M. were waiting for her. L.M. was sitting on the floor, looking downcast. J.M. told her that defendant had been in L.M.'s room and touched her, and that it had happened the night before. She did not ask L.M. any other questions, but told her she would talk to her father about it. It was apparent to her that L.M. was looking to J.M. to tell her what happened. When her husband and defendant arrived home at 3:30 a.m., she told him about it. He and defendant had been drinking, and he confronted defendant and a fight ensued. Police were called by neighbors because of the noise, and a female officer talked with L.M. The officers suggested that L.M. be

examined by a doctor, which was done later that day. She told L.M. to simply tell Jobe and Gordon the truth; she never asked L.M. for details.

Moore testified that in 1990 her husband and defendant had a disagreement over rules for the children while defendant was staying with them. Defendant left something on the stove and it burned, engulfing the house in smoke. After that, they told defendant to leave.

Nine-year-old J.M. testified that the first incident L.M. relayed to him was when defendant took their clothes off and she was trying to get him off her but could not. (His testimony was confusing on this incident. The first time he was asked about it, it appeared he was describing the incident as related to him by L.M. However, when he again described the incident in his later testimony, he appeared to describe what he himself had seen.) He stated the next day L.M. told him what had happened and J.M. told her he had seen it happen. She begged him not to tell and he said he would let it pass, but, if it ever happened again and she did not tell their parents, he would. They both thought if they told the first time they would be in trouble. He testified he was in a hallway when he saw defendant and L.M. on the couch. They were facing away from him and could not see him. L.M. had her eyes closed and was trying to get defendant off her. L.M. told him defendant was on top of her and had his hands between her legs. She did not tell him that defendant had touched her with any other part of his body. The second time, L.M. told him that defendant had come into her room and was feeling her private parts. He told their stepmother when she was tucking them into bed.

With respect to the first incident occurring in 1990, the trial court ruled there was no statement by L.M. to J.M. The only testimony before the court was that L.M. had discussed the incident with J.M. and she begged him not to tell. The court ruled the State could elicit from J.M. the fact that L.M. begged him not to tell, as that would be proper to explain why J.M. did not report this incident earlier. However, the State was not allowed to elicit details of anything L.M. told J.M. the day following the incident.

As to the statement made to Moore on January 31, 1992, the court found there was no basis under section 115—10 of the Code to admit J.M.'s statement to Moore about what L.M. had told him. However, the court ruled the State could elicit testimony that J.M. had told Moore something about what he claimed L.M. had told him, in order to explain to the jury why Moore took the steps she did.

The court found L.M.'s statement to J.M. on January 31, 1992, about what had happened the day before to be admissible, based upon

the following factors: (1) the statement was made less than 24 hours after the incident; (2) it was made to a confidant; (3) it contained a description of sexual conduct not normally familiar to a child unless exposed to it; (4) L.M. used terminology a child would be expected to use; (5) there was no apparent motive to accuse defendant falsely, and he was a family member which would have made it more difficult to report; and (6) L.M. expected to get into trouble but, despite this, made the statement.

The court ruled the statement made by L.M. to Officer Jobe concerning the events of January 30, 1992, was admissible, based upon the facts that (1) the time lapse was less than 48 hours, (2) no leading questions were asked, (3) L.M. used terminology consistent with her age, (4) she was discussing sexual conduct that a child her age would not be familiar with unless exposed to it, and (5) there was no apparent motive to lie.

The court found the statement made by L.M. to Officer Jobe concerning the alleged events of August 1990 admissible. The court found that although there was a much more significant time lapse than with the other statements, this was partially explained by J.M.'s testimony that L.M. begged him not to tell anyone what had happened because she thought she would get in trouble. The court did not consider the fact that J.M. said he saw the incident L.M. told him about. The court found reliability in the terminology used by L.M., the fact that she was reluctant to discuss it, and that she made an attempt to be accurate in terms of changing her mind about the length of time the incident lasted.

At the jury trial, L.M. testified that defendant baby-sat for her when she was five and six years of age. The first incident occurred when she was five. She and defendant were watching television, he took her into J.M.'s room, and he put his private into her private. "Green gooey stuff" came out of his private before he stopped, and he washed it off with a towel. The only person she told was J.M. Defendant put his finger in her private last year while she was sleeping, and he touched her inside her T-shirt. She told him to stop, but he kept doing it for a little while and then left. The next night she told J.M. about it, and they told their stepmother the next day. L.M. used anatomically correct dolls to show the jury what she meant by "private" part.

On cross-examination, L.M. testified that during the first incident her parents were gone and she did not know where J.M. was. She told J.M. what had happened when he was home later that evening. She does not remember whether she told J.M. not to tell their par-

ents. She then admitted she told Jobe she had asked J.M. to tell her parents. On redirect, L.M. testified she and her brother decided to keep it a secret for awhile because she was scared. On re-cross-examination, she testified she did not know whether she had told J.M. to tell her stepmother about the incident with defendant in the bedroom.

Moore testified that defendant had stayed with her family from February to August 1990 and from late December 1991 to the end of January 1992. He took care of the children during the first visit while she and her husband worked, and he slept in the back bedroom. J.M. came to live with them in June 1990 and, from that time on, defendant shared a room with J.M. There may have been times when defendant would baby-sit overnight.

The second time defendant stayed with them, he slept on the couch in the living room. She began to notice that L.M. avoided being around defendant. Defendant stayed overnight with them on January 30, 1992, and slept on the living room couch. The next morning was very hectic with getting the children ready for school, the baby ready for day care, and getting breakfast for them. She did not speak to J.M. or L.M. alone that morning. At that time defendant was asleep on the couch, which was about eight feet from where they ate breakfast. She arrived home from work about 6:30 p.m. J.M. told her something L.M. had told him; she told her husband about it, and he confronted defendant. Police officers arrived and, at their suggestion, she took L.M. to a hospital. Prior to Jobe arriving at the house, she stressed to L.M. to simply tell the truth.

J.M. testified the reason he waited to tell his stepmother about what had happened to L.M. was that he thought they might get in trouble if they told right away.

Jobe testified that L.M. told her defendant had come into her room, woke her up, and put his finger in her private part. After she asked him to stop, he did and left. L.M. also told her that one to two years previously defendant had taken her clothes off, his clothes off, and put his private part on her private part. Jobe then testified to her conversation with L.M. as she had done at the section 115—10 hearing, including her description of L.M.'s demeanor during the interview.

Dr. Ricky Pionkowski testified that he is a medical doctor and works in the emergency room at Covenant Medical Center in Urbana. He has had experience with victims of sexual assault, including child victims. He examined L.M. on February 1, 1992, for signs of molestation. She told him that defendant had touched her in her private parts on two occasions, once with his finger and the other time with his pri-

vate part. Upon examination, he noticed a green discharge coming from L.M.'s vagina, which is not normal in a child her age. There was a little redness around the opening to the vagina. He concluded she had an infection, which could have come from an adult finger being inserted in her vagina. His findings were consistent with what L.M. had told him, and he found nothing to lead him to disbelieve what she had told him.

On cross-examination, Pionkowski testified it is impossible to determine time of onset of an infection just by looking. Most infections take from 12 to 48 hours to develop a discharge. If it had been less than 12 hours, he would tend to disbelieve the infection could have been caused by a finger. It is possible that she had the infection for three days prior to his examining her. He also observed a small amount of feces which might have caused the infection. That would also be consistent with his findings.

On redirect examination, the doctor testified that L.M. told him her vaginal area was sore and that it is also possible she was not wiping herself thoroughly because of the soreness.

Dr. Ronald Deering, a pediatrician, testified he has had experience in examining child sex-abuse victims. He examined L.M. on February 6, 1992, and saw evidence of an old tear at the bottom of the hymenal ring. That would be consistent with trauma to that area occurring one to two years earlier, such as an adult penis partially penetrating that area.

On cross-examination, Deering stated the tear could also have been caused by other things and that it is possible it was not such a tear at all.

At the close of the State's evidence, defendant moved for a directed verdict on all counts. The State moved to withdraw count I (aggravated criminal sexual abuse) and count IV (aggravated criminal sexual assault in that defendant placed his penis on L.M.'s vagina). The court allowed the State's motion, finding the only evidence was of a finger and a penis penetrating L.M.'s vagina. The court denied the motion for a directed verdict as to counts II and III (both aggravated criminal sexual assault).

Over defendant's objection, the court instructed the jury only on the offense of aggravated criminal sexual assault and refused to instruct on aggravated criminal sexual abuse, which defense counsel claimed was an included offense. Defendant was convicted on both counts, and the court entered judgment on the verdicts.

At the sentencing hearing, Bruce Freeman testified for the State in aggravation, over defense counsel's objection. He was a licensed

clinical social worker with the Department of Psychiatry at Christie Clinic. He had seen L.M. for some behavioral problems, possibly stemming from the sexual abuse. He had also been seeing J.M. for some behavior problems. His first formal session with J.M. was November 6, 1992. On that date, J.M. told him he had, before he moved to Champaign to live with his father and stepmother, witnessed physical abuse by his natural mother's boyfriends toward her and that he had been the subject of that abuse several times. When Freeman asked J.M. whether he had been touched in a way that made him feel uncomfortable, J.M. hesitated and then said that he had been abused by defendant. This happened when he was six or seven years old at his paternal grandmother's house. He was to sleep with defendant and, as he was falling asleep, defendant began to fondle him. Defendant asked him to roll over on his stomach and he then pulled J.M.'s nightshirt up over his head. Defendant put his penis in J.M.'s butt and began moving around. Defendant continued until J.M. felt something like water coming out of his butt and then defendant stopped. J.M. got up to go to the bathroom and while cleaning his butt, there was "gooky goo" coming out of it. It was whitish yellow, as when eggs and water are mixed together. J.M. reported that on two earlier occasions defendant had fondled J.M.'s penis. J.M. stated he did not tell anyone about these incidents. J.M. reported a great sense of shame for not telling about what had happened to him when his father and court personnel asked if he had ever been sexually abused. He seemed to worry that he would not be believed. He also was concerned that people would think he was competing with L.M. for attention. He was also fearful of changing his prior answer, and Freeman said J.M. wept while relating these incidents. He became even more upset when wondering whether his father would believe him.

In admitting the evidence, the court found it was sufficiently reliable for purposes of the sentencing hearing. Even though there was a considerable time lapse between the alleged incident and reporting it to Freeman, the court found this understandable, given the difficult nature of the topic and J.M.'s background of violence and powerlessness. The court also noted J.M. had described the incident in terms one would expect to hear from a child. It also noted the shame with which J.M. made the disclosure to Freeman, noting it was unlikely the child would cause himself such pain by telling a merely fanciful story.

The court found no factors in mitigation and, as aggravating factors, found the following: (1) defendant was on probation at the time of the offenses and had prior criminal convictions, one of which was for criminal sexual abuse; (2) the incidents occurred over a period of

time and involved a calculated, premeditated single course of conduct over a substantial period of time; (3) defendant betrayed a defenseless and trusting child and other family members after they took him into their home; (4) defendant showed no remorse; (5) there appears to be little, if any, hope for defendant's rehabilitation, based upon his prior probation sentences; and (6) the report by J.M. of sexual abuse perpetrated upon him by defendant, which the court indicated it believed. Defendant was sentenced to 12 years' imprisonment for the charge stemming from the summer of 1990, and 18 years' imprisonment for the charge based upon the incident on January 30, 1992. The court found this was a single course of conduct for purposes of section 5—8—4(a) of the Unified Code of Corrections (Corrections Code) (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—4(a)) and ordered the sentences served consecutively.

Defendant first argues on appeal that the trial court erred in refusing to instruct the jury on the offense of aggravated criminal sexual abuse and in allowing the State to withdraw count I charging that offense. He maintains there was some evidence from which the jury could have concluded he was guilty of aggravated criminal sexual abuse in both incidents.

An included offense is one which is (1) established by proof of the same, or less than all the facts, or a less culpable mental state, or both, than that required to establish commission of the offense charged; or (2) consists of an attempt to commit the offense charged or an offense included therein. (Ill. Rev. Stat. 1991, ch. 38, par. 2—9.) A defendant may be entitled to have the jury instructed on a less serious offense that is included in the one with which he is charged. However, because a defendant's instruction is appropriate only if evidence would enable the jury to convict him of the lesser offense and acquit him of the greater one, the evidence presented in a particular case might preclude the use of an instruction on a lesser offense. (*People v. Bryant* (1986), 113 Ill. 2d 497, 507, 499 N.E.2d 413, 417.) For an offense to be an included offense, it must not have any element not included in the greater offense, so that it is impossible to commit the greater offense without also committing the lesser offense. (*People v. Gulley* (1987), 162 Ill. App. 3d 545, 547, 515 N.E.2d 1309, 1310.) Very slight evidence upon a certain theory of the case justifies giving an instruction. *People v. Creamer* (1986), 143 Ill. App. 3d 64, 69, 492 N.E.2d 923, 927.

The difference between the offenses of aggravated criminal sexual assault and aggravated criminal sexual abuse lies in the defendant's conduct. In the former offense, there must be contact, however slight,

between the sex organ of one person and the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person into the sex organ or anus of another person. (Ill. Rev. Stat. 1991, ch. 38, par. 12—12(f).) In aggravated criminal sexual abuse, sexual conduct is the key element, which is defined as touching or fondling by an accused of the victim's sexual organ, breast, or anus, or any part of the body of a child under 13 years of age, for purposes of sexual gratification of the accused or victim. (Ill. Rev. Stat. 1991, ch. 38, par. 12—12(e).) Defendant points out that although L.M. testified at trial that in 1990 defendant put his penis in her vagina, Jobe testified L.M. told her that defendant had put his penis *on* her vagina. He also believes there was evidence there may not have been penetration by defendant's finger in the 1992 incident. However, the nature of this evidence is unclear.

At the jury instruction conference, defense counsel objected to the State's tendered instructions Nos. 4 and 13. Instruction No. 4 stated defendant is charged with aggravated criminal sexual assault in the summer of 1990 and on January 30, 1992. Instruction No. 13 reiterated this information and instructed the jury concerning the verdict forms it would be receiving. In making his objection, defense counsel argued the jury should be instructed on aggravated criminal sexual abuse or criminal sexual abuse as included offenses. The court stated there was no evidence of other sexual conduct, so it was a situation in which defendant was either guilty of aggravated criminal sexual assault or nothing.

■ We note defense counsel did not tender instructions to the court on the offenses of aggravated criminal sexual abuse or criminal sexual abuse. At the hearing on defendant's motion for a new trial, defense counsel stated his reason was that the court had already ruled there was no included offense under the facts of the case. It is well settled that a party cannot complain of a failure to give an instruction unless he or she tendered the instruction at trial. (See *People v. Huckstead* (1982), 91 Ill. 2d 536, 543, 440 N.E.2d 1248, 1251; *People v. Berry* (1984), 99 Ill. 2d 499, 503, 460 N.E.2d 742, 743.) We thus find that defendant has waived any error in the trial court's failure to instruct on alleged included offenses.

Defendant next contends the trial court erred in allowing hearsay testimony about circumstances surrounding L.M.'s statements regarding elements of the offenses. He argues the court should not have allowed Moore to testify how J.M. told her about L.M.'s complaint or why he did not tell his parents what L.M. had told him, and it should not have permitted Jobe to testify about L.M.'s demeanor during her

interview. In defendant's view, this evidence merely served to buttress L.M.'s credibility, given her "late" reports of abuse, and went beyond limits established by section 115—10 of the Code.

■ We need not consider the merits of defendant's arguments on this point, as we must find defendant has waived any error in the admission of the complained-of statements. Although he did raise this issue in a vague manner in his post-trial motion, in which he referred only to "the hearsay statements," he failed to object to any of the testimony at trial. Both a trial objection and a written post-trial motion raising the issue are required to preserve error for appeal purposes. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.) Nor are we willing to consider defendant's arguments under the plain-error doctrine. That doctrine gives relief from the waiver rule only where the evidence is closely balanced or where the error affects the substantial rights of the defendant. (*People v. Griffiths* (1983), 112 Ill. App. 3d 322, 326, 445 N.E.2d 521, 526; *People v. Pickett* (1973), 54 Ill. 2d 280, 283, 296 N.E.2d 856, 858.) Here, the evidence was not closely balanced, nor has defendant pointed to any specific rights which were abridged by the admission of the statements.

Defendant next argues the trial court erred in imposing consecutive sentences. He contends that under the supreme court's recent decision in *People v. Bole* (1993), 155 Ill. 2d 188, 613 N.E.2d 740, the two criminal acts of which he stands convicted did not constitute a single course of criminal conduct and consecutive sentences were not mandated by section 5—8—4(a) of the Corrections Code. We agree. That section provides as follows:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or where the defendant was convicted of a violation of Section 12—13 or 12—14 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—4(a).)

The trial court specifically found defendant's criminal acts constituted a single course of conduct under this section and ordered the sentences to run consecutively. In *Bole*, defendant pleaded guilty to three counts of criminal sexual assault. (*People v. Bole* (1991), 223 Ill. App. 3d 247, 249, 585 N.E.2d 135, 137.) The offenses were committed

against his 14-year-old stepdaughter on three separate days from February 22, 1989, to March 1, 1989. Finding that defendant's actions constituted a single course of conduct for purposes of section 5—8—4(a) of the Corrections Code, the trial court sentenced him to three consecutive terms of imprisonment. The appellate court vacated the sentences and remanded for resentencing, holding there was no single course of conduct. (*Bole*, 223 Ill. App. 3d at 260, 585 N.E.2d at 145.) The supreme court, in affirming the appellate court, acknowledged the offenses were part of a long-standing pattern of sexual abuse of defendant's stepdaughter. (As noted by the dissenting opinion, the stepdaughter testified defendant had sexual relations with her over 100 times and that the abuse occurred several times a week when her mother was out of the house. (*Bole*, 155 Ill. 2d at 199-200, 613 N.E.2d at 746 (Heiple, J., dissenting).) However, the court held the offenses were not part of a single course of conduct and that consecutive sentences were not mandated. The court noted the offenses occurred on three separate days, with substantial interruptions of time between them. *Bole*, 155 Ill. 2d at 193-94, 613 N.E.2d at 743.

■ In contrast to *Bole*, approximately 1½ years separated defendant's two offenses in the present case. It is therefore readily apparent that applying the rationale of *Bole* to this case requires we vacate defendant's sentences and remand to the trial court for resentencing. The State argues that regardless of whether consecutive sentences were mandated under the theory of a single course of conduct, the trial court had the discretion to impose consecutive sentences under section 5—8—4(a) of the Corrections Code. While this is true, it is clear from a review of the record that the trial judge believed consecutive sentences were indeed mandated under that section and he expressly ordered the sentences to run consecutively based upon this interpretation.

Defendant's final argument on appeal is that the trial court erred in considering in aggravation testimony of the social worker as to statements made by J.M. regarding sexual abuse of him by defendant. Because of the likelihood that the State will again present this evidence at defendant's sentencing hearing on remand, we will address this argument.

Defendant argues this evidence was unreliable because a significant gap existed between the occurrence of the alleged abuse and J.M.'s report of it, and because J.M. had many opportunities to report the abuse to his parents, court personnel, DCFS, and police investigators and did not do so. The State finds the evidence reliable and urges the trial court did not err in its consideration.

It is well settled that in determining an appropriate sentence the trial court is not required to consider only information admissible at trial. The rules of evidence to be applied at trial regarding defendant's guilt or innocence do not apply in a sentencing hearing. The court may search anywhere within reasonable bounds for other facts which may serve to aggravate or mitigate the offense. It may inquire into a defendant's general moral character, habits, social environment, abnormal tendencies, age, natural inclination or aversion to commit crime, and stimuli motivating his conduct, in addition to his family life, occupation, and criminal record. (*People v. Adkins* (1968), 41 Ill. 2d 297, 301, 242 N.E.2d 258, 260-61.) Thus, criminal conduct not resulting in conviction may be considered. See *People v. Kelley* (1970), 44 Ill. 2d 315, 255 N.E.2d 390; *People v. Poll* (1980), 81 Ill. 2d 286, 408 N.E.2d 212; *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.

In ruling evidence of defendant's alleged abuse of J.M. admissible, the trial court made the following observations:

"I believe that the evidence offered is sufficiently reliable to admit it for purposes of this hearing and the limited purposes of aggravation. I note that while there has been a substantial delay between the time of the alleged occurrence and his reporting it to Mr. Freeman, that delay is understandable[,] given the very difficult topic that the young man was discussing with Mr. Freeman, given his own background of having observed so much violence in his home and feeling powerless. I also find it significant that the young man described this occurrence in terms that one would expect to hear a child describing such conduct as opposed to terms that one would expect to hear from a more sophisticated or mature individual. I also note the apparently marked shame and regret with which the child did make this disclosure to Mr. Freeman, and it would seem to suggest that his motivation was not to disclose as opposed to [to] disclose and difficult to imagine he would impose this kind of pain on himself for purposes of pursuing some fanciful story. So I believe that given the standard that applies at a sentencing hearing, that evidence is sufficiently reliable. The defense's objection is overruled."

Defendant bases his argument in part on his belief that J.M.'s testimony at the section 115—10 hearing was not believable. At that hearing, with regard to the 1990 incident, J.M. testified he witnessed the occurrence, while L.M. testified at trial that she was alone with defendant at the time of the incident. We note there was some confu-

sion created by J.M.'s testimony, and the trial court acknowledged it was unsure whether J.M. was describing what L.M. had told him or what he himself had witnessed. For that reason, the court ruled there was no statement by L.M. to J.M., and the State was prohibited from eliciting details of any such statement. It was merely allowed to elicit from J.M. that L.M. had begged him not to tell their parents about the incident. Defendant also points out that J.M. had lived in an abusive situation prior to living with his father and stepmother. Defendant also suggests that (1) it is possible J.M. had either been victimized or witnessed abuse in his first home, (2) he could have been "extrapolating" from stories he had heard in the past about defendant's abuse of L.M., (3) the trial court had no way to judge J.M.'s level of sexual sophistication because he did not personally testify at the sentencing hearing, and (4) J.M.'s telling his story just prior to defendant's sentencing could be considered a play for attention. Defendant also complains about the hearsay nature of the evidence presented. He argues he should have had the opportunity to cross-examine J.M.

The most important factors in determining whether evidence may be considered at a sentencing hearing is that it be both relevant and reliable. (*People v. Jackson* (1992), 149 Ill. 2d 540, 549, 599 N.E.2d 926, 930, *cert. denied* (1993), ___ U.S. ___, 122 L. Ed. 2d 786, 113 S. Ct. 1416; see also *People v. Meeks* (1980), 81 Ill. 2d 524, 535, 411 N.E.2d 9, 15.) Admissibility of such evidence lies within the sound discretion of the trial court. (*People v. Lyles* (1985), 106 Ill. 2d 373, 414, 478 N.E.2d 291, 309.) Thus, hearsay evidence, while not generally admissible at trial, may be considered by the trial court at a sentencing hearing. (See *People v. Monk* (1988), 174 Ill. App. 3d 528, 539, 528 N.E.2d 1063, 1070; *People v. Ramsey* (1975), 24 Ill. App. 3d 1038, 1041, 322 N.E.2d 547, 549; *People v. Schleyhahn* (1972), 4 Ill. App. 3d 591, 597, 281 N.E.2d 409, 414; *People v. Perez* (1985), 108 Ill. 2d 70, 86, 483 N.E.2d 250, 258.) A hearsay objection goes to the weight, not the admissibility, of the evidence. *People v. Tigner* (1990), 194 Ill. App. 3d 600, 607, 551 N.E.2d 304, 308, *cert. denied* (1990), 498 U.S. 901, 112 L. Ed. 2d 218, 111 S. Ct. 261.

■ Defendant objects to the hearsay evidence on the ground that J.M.'s testimony at the section 115—10 hearing was not reliable. However, that conclusion does not necessarily follow from the fact that the trial court refused to allow testimony at trial concerning L.M.'s statement to J.M. about the 1990 incident. The court's rationale for this ruling was not that J.M.'s testimony was not reliable, but rather that it was unsure just what L.M. had said to J.M. about the incident. It is clear that J.M. witnessed a sexual assault on L.M. by

defendant. It is simply not certain whether that incident is the same one relayed to J.M. by his sister. We also find no significance (except that recognized by the trial judge) in the fact that J.M. had previously lived in an abusive situation with his natural mother. In addition, there is no evidence that J.M. may have been "extrapolating" from stories he heard in the past about defendant's abuse of L.M.

There is no question that the hearsay testimony to which defendant objects was relevant. The only question is its reliability. The social worker testified as to the circumstances in which J.M. told of defendant's alleged sexually abusive conduct. We note the child did not volunteer this information, but only responded to a specific question from the social worker as to whether he had ever been touched in a way that made him feel uncomfortable. It is also significant that J.M. had a difficult time revealing what had happened to him, and that he cried and felt ashamed and guilty he had not told his father and court personnel about the incident when he had the opportunity. J.M.'s reasons for not telling were reasonable—he feared he would not be believed, and he was concerned people would think he was competing with L.M. for attention. He also feared people would be angry with him if he changed his answer. He became more upset when wondering whether his father would believe him. In addition, as the trial court noted, J.M. described the incident in terms one would expect to be used by a child his age. Given these factors, we do not find the trial court's conclusion this evidence was reliable to be clearly erroneous.

For the reasons stated, defendant's convictions are affirmed. The sentences are vacated and the cause remanded to the trial court for resentencing.

Affirmed in part; vacated in part and remanded.

KNECHT and GREEN, JJ., concur.