NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200601-U

NO. 4-20-0601

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 10, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Ford County |
| RYAN SCHOOLCRAFT, | ) | No. 18CF3 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Matthew John Fitton, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant was not denied the reasonable assistance of counsel at the first stage of
postconviction proceedings.

¶ 2    Defendant, Ryan Schoolcraft, appeals from the trial court's order summarily

dismissing his petition for postconviction relief, which was prepared with the assistance of

privately retained counsel. Defendant contends postconviction counsel, who he alleges operated

under an actual conflict of interest, provided unreasonable assistance by raising a single,

"obviously meritless" issue in the postconviction petition while failing to raise several arguably

meritorious claims apparent from the record. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                                A. The Charges

¶ 5       In July 2018, the State charged defendant by amended information with two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) (counts I and III) and one count of criminal sexual assault (*id.* § 11-1.20(a)(3)) (count II). The State alleged that between March 2014 and May 2016, defendant put his finger in A.C.'s vagina (count I), made contact with A.C.'s mouth with his penis (count II), and made contact with A.C.'s vagina with his mouth (count III).

¶ 6                              B. Pretrial Proceedings

¶ 7       Prior to trial, the State filed a motion pursuant to section 115-11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-11 (West 2016)), requesting the trial court exclude all persons without a "direct interest" in the case from the courtroom while A.C. testified. The court granted the motion following a hearing, ruling that only A.C.'s support person, the media, and her family members that were not testifying would be allowed to remain in the courtroom during her testimony.

¶ 8       The State subsequently filed a supplemental answer to discovery in which it indicated its intention to call Johanna Hager as an expert witness who would testify regarding "characteristics that children, in general, can exhibit with child abuse in general." The State further requested Hager be allowed to remain in the courtroom during A.C.'s testimony. The trial court ultimately ruled that Hager would be allowed to testify as an expert and remain in the courtroom during A.C.'s testimony.

¶ 9                              C. Jury Trial

¶ 10      Defendant's jury trial began on January 7, 2019, and concluded on January 10, 2019. We discuss only the evidence relevant to the issues raised on appeal.

¶ 11                             1. *Evidence Presented*

¶ 12                                          a. A.C.

¶ 13          A.C. testified she was born in April 2002. A.C. had known defendant, who she described as her step-father, since she was approximately four years old, which is when he began dating A.C.'s mother, Anna Schoolcraft (Anna). A.C. explained that at the time of trial, Anna and defendant were legally married but separated. Defendant and Anna also had two children together, K.S. and C.S., who were five and six years younger than A.C., respectively.

¶ 14          A.C. testified that when she was eleven years old, her family moved to Kansas City, Missouri, because defendant got a better job there. One morning shortly after arriving in Kansas City, defendant got into A.C.'s bed with her, wrapped his arm around her stomach and pulled her close to him, and then said, "Don't ever tell your mom or else." A.C. testified defendant did not touch her inappropriately but she did not understand why he told her not to tell her mother. Not long after this initial incident, defendant began getting into bed with A.C. more frequently. Defendant would touch her breasts, buttocks, and vagina.

¶ 15          According to A.C., the family moved back to Illinois in March 2014. A.C. testified that defendant began touching her inappropriately again approximately one month after their return to Illinois. Around this time, in addition to touching A.C.'s breasts, buttocks, and vagina with his hands, defendant also started to pull down her pants and lick her vagina. A.C. further testified that, "towards the end of it," sometime around May 2016 when she was 14 years old, defendant would occasionally try to put his penis in her mouth. A.C. explained that she did not report the abuse during this time because she lived in a small town and feared people in the community would think she was lying or "making it up for attention."

¶ 16          According to A.C., defendant and Anna "filed for a separation" in May 2016. That same month, Anna moved in with her mother, while the children stayed with defendant.

The following month, defendant and the children moved into a different house. In September 2016, A.C. moved into her aunt's house for several weeks until Anna found an apartment, at which point A.C. moved in with Anna. On cross-examination, A.C. acknowledged that she did not disclose the abuse until July 2017, which was approximately one year after she stopped living with defendant.

¶ 17                                    b. Johanna Hager

¶ 18          Johanna Hager, a licensed clinician and forensic interviewer for a child advocacy center, testified she did not conduct any interviews in relation to the instant case. Hager testified with respect to the characteristics of the "child sexual abuse accommodation syndrome." Hager explained that she used the acronym "SHEDR" to identify the typical symptoms or behaviors exhibited by children who have been sexually abused. According to Hager, the "S" stands for secrecy or shame, "H" stands for helplessness, "E" stands for entrapment, "D" stands for disclosure, and "R" stands for retraction.

¶ 19          With respect to disclosure, Hager testified that "[m]ost people go to their graves never telling about their sexual abuse, most. So we are dealing with a very small population of people that actually will talk about it." Hager further testified that it is "very uncommon" for the children who do make a disclosure to do so immediately after the abuse has occurred. Hager explained that "all [of] the moments for this journey of disclosure *** are related to safety ***." According to Hager, sometimes a change in family circumstances, such as a divorce, may lead to a child feeling safer and, ultimately, to disclosure.

¶ 20                                    c. Defendant

¶ 21          Defendant denied ever touching A.C. in an inappropriate manner. Defendant testified that, in his opinion, A.C. fabricated the allegations against him because, based on

- 4 -

divorce negotiations, defendant was going to get a "right of first refusal" with respect to K.S. and C.S. Defendant explained that this meant if Anna was not available to watch the children during her scheduled time, defendant would be able to do so. Defendant further explained that A.C. normally watched K.S. and C.S. if Anna was unavailable. Thus, defendant believed A.C. made up the allegations "for her mom and to get her siblings away from me."

¶ 22                    2. *Finding of Guilt*

¶ 23        Following closing arguments and deliberations, the jury found defendant guilty on all counts.

¶ 24                    D. Posttrial Proceedings

¶ 25        In February 2019, the trial court granted defendant's motion for substitution of counsel requesting Maureen Williams be permitted to serve as his attorney during posttrial and sentencing proceedings. Also in February 2019, Williams filed a timely "placeholder" motion for new trial on behalf of defendant. In the motion for new trial, defendant challenged the sufficiency of the evidence and raised a claim of ineffective assistance of trial counsel. However, neither claim was supported by specific facts or citations.

¶ 26        At a telephone conference conducted on February 21, 2019, Williams informed the State and the court that she intended to request a continuance of the sentencing hearing, which was scheduled for February 26, so she would have sufficient time to obtain the trial transcripts and add substance to the motion for new trial. The State objected, noting section 5-4-3.1 of the Unified Code of Corrections (730 ILCS 5/5-4-3.1 (West 2018)) required defendant be sentenced within 65 days of the guilty verdict. The State also noted "[a]ny motion for continuance shall be in writing and supported by affidavit," and the victim must receive notice. See *id.* § 5-4-3.1(c). The trial court told Williams she had until the sentencing hearing to file a

motion to continue that complied with the statute and, "depending on how I rule, there will be a continuance or we will proceed on the sentencing."

¶ 27        Prior to the February 26 hearing, Williams filed a motion to continue in compliance with the statute. At the hearing, Williams argued that, "in the interest of justice," the court should grant her motion because she could not proceed on a motion for new trial without reviewing the trial transcripts. Williams further argued, "this is [defendant's] one shot. The Appellate Court repeatedly says, if you could have raised it and given the trial court a chance to correct it, it should have been raised in that motion for a new trial." The State did not object to having the proceedings "continued to somewhere around the 65th day." Ultimately, the trial court granted a continuance to March 11, 2019, which it stated was "right about the 65th day, it has to be." In doing so, the court noted that, "in all likelihood, [we] still are not going to have the transcripts."

¶ 28        On March 11, 2019, the case proceeded to sentencing. Williams did not (1) file an amended motion for new trial, (2) request another continuance to obtain the transcripts, or (3) mention the "placeholder" motion on file. A March 11, 2019, docket entry reads, "Atty Williams moives [*sic*] to Dismiss Defendant's Motion for a New Trial and [it] is so dismissed."

¶ 29                              E. Sentencing

¶ 30        At the sentencing hearing, the State called several witnesses in aggravation, including C.P. and M.F. C.P., who was 35 years old at the time of the hearing, testified she dated defendant for approximately 6 years, beginning when she was 15 years old and he was 23 years old. Defendant had sex with C.P. while she was a minor. C.P. also testified defendant was physically abusive to her on multiple occasions. According to C.P., defendant convinced her that he "was going to marry the first girl to give him a threesome." C.P. subsequently invited her

friend, M.F., over. C.P. testified both she and M.F. were 16 years old at the time. C.P. further testified that, when M.F. came over, she (C.P.) had oral sex with M.F. and defendant also had oral sex with M.F. M.F.'s testimony corroborated C.P.'s testimony regarding this incident.

¶ 31        The trial court subsequently sentenced defendant to 15 years' imprisonment on the two counts of predatory criminal sexual assault of a child and 5 years' imprisonment for criminal sexual assault. The court ordered the sentences to run consecutively, for a total of 35 years' imprisonment.

¶ 32        No direct appeal was filed.

¶ 33                          F. Postconviction Proceedings

¶ 34        Defendant retained Williams to file a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). Defendant filed the petition on July 27, 2020, and filed an amended petition on August 26, 2020. Defendant raised a claim of ineffective assistance of counsel, arguing trial counsel was ineffective for failing to properly "stress" the consequences he faced if convicted after a jury trial as opposed to pleading guilty. The trial court summarily dismissed the petition in a written order.

¶ 35        This appeal followed.

¶ 36                                II. ANALYSIS

¶ 37        Defendant argues postconviction counsel, who he alleges operated under an actual conflict of interest, provided unreasonable assistance in preparing his postconviction petition because counsel raised "an obviously meritless" issue and failed to raise several arguably meritorious claims which were apparent from the record. Specifically, defendant asserts reasonable postconviction counsel would have raised the following three claims: (1) posttrial counsel rendered ineffective assistance under *United States v. Cronic*, 466 U.S. 648 (1984);

(2) defendant was denied a fair trial where the State's child-abuse expert was allowed to listen to A.C.'s testimony and improperly bolster her credibility; and (3) posttrial counsel rendered ineffective assistance by failing to object to irrelevant witnesses at the sentencing hearing. Whether postconviction counsel provided reasonable assistance is reviewed *de novo*. See, *e.g.*, *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007).

¶ 38                                A. The Act and "Reasonable Assistance"

¶ 39        The Act (725 ILCS 5/122-1 *et seq.* (West 2018)) sets forth a three-stage procedure by which criminal defendants may assert their conviction or sentence resulted from a substantial denial of their constitutional rights. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). At the first stage, the trial court independently reviews the postconviction petition to determine whether it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). A petition is frivolous or patently without merit "only if the petition has no arguable basis either in law or in fact. A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). If the court determines the petition lacks arguable merit, it must dismiss the petition by written order. 725 ILCS 5/122-2.1(a)(2) (West 2018). If the petition is not dismissed, it advances to the second stage of proceedings. *Id.* § 122-2.1(b).

¶ 40        Criminal defendants have no constitutional right to postconviction counsel. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *People v. Moore*, 189 Ill. 2d 521, 541 (2000). Nonetheless, our supreme court "has long held that, at the second and third stages of postconviction proceedings, defendants are entitled to a 'reasonable' level of attorney assistance." *People v. Johnson*, 2018 IL 122227, ¶ 16. Recently, in *Johnson*, the supreme court held "that a defendant who retains a private attorney at the first stage of postconviction

- 8 -

proceedings is entitled to a reasonable level of assistance of counsel." *Id.* ¶ 23. The First District, in *People v. Zareski*, 2017 IL App (1st) 150836, sought to articulate a workable standard for determining what constitutes "reasonable assistance" in the context of Illinois Supreme Court Rule 651 (eff. July 1, 2017). The *Zareski* court determined that a "*Strickland*-like analysis is the appropriate standard to use for reasonable assistance claims" based on postconviction counsel's failure to raise an allegedly meritorious argument in the initial petition. *Id.* ¶ 59. Under this analysis, the reasonableness of counsel's assistance is dependent upon whether the defendant suffered prejudice from a particular claim not being raised. *Id.* ¶ 61. Stated differently, counsel cannot be found to have provided unreasonable assistance for failing to raise a claim if the claim has no merit. *Id.*

¶ 41          We find the analysis in *Zareski* helpful and agree that, in order to succeed on a claim postconviction counsel provided unreasonable assistance by failing to raise a particular claim, a defendant must demonstrate that he was prejudiced by the omission. A defendant does so by establishing the claim has arguable merit and would have survived summary dismissal if it had been included in the petition. See *id.* ¶ 60 ("[I]n evaluating the performance of postconviction counsel, whether the petitioner was prejudiced (at a minimum) should be part of the inquiry."); *Johnson*, 2018 IL 122227, ¶ 24 ("If the circuit court determines the claims raised in defendant's supplemented motion to reconsider are frivolous or patently without merit, then the failure to include those claims would not amount to a denial of reasonable assistance of counsel, and defendant would not be entitled to relief."). Therefore, we turn now to the claims defendant asserts counsel should have raised in the postconviction petition to determine whether any of them contain arguable merit sufficient to withstand first-stage dismissal.

¶ 42    B. Whether Postconviction Counsel
Provided Reasonable Assistance

¶ 43    Defendant contends postconviction counsel provided unreasonable assistance by failing to raise three allegedly meritorious claims in the petition that were readily apparent from a review of the record: (1) posttrial counsel rendered ineffective assistance under *Cronic*, 466 U.S. at 648; (2) defendant was denied a fair trial where the State's child abuse expert was allowed to listen to A.C.'s testimony and then improperly bolstered A.C.'s credibility through her own testimony; and (3) posttrial counsel rendered ineffective assistance by failing to object to irrelevant testimony at the sentencing hearing.

¶ 44    1. *Ineffective Assistance Under* Cronic

¶ 45    Defendant first argues that postconviction counsel operated under an actual conflict of interest and provided unreasonable assistance by failing to argue that she rendered ineffective assistance under *Cronic* during posttrial proceedings. Specifically, defendant asserts that as a result of failing to file either a substantive motion for new trial or a notice of appeal, posttrial counsel "failed to subject the State's case to meaningful adversarial testing at a critical juncture—litigation of the motion for new trial and, presumably in connection with the decision to appeal." In the alternative, defendant contends reasonable counsel would have argued the trial court abused its discretion in denying his request to continue the hearing on his motion for new trial until he was able to secure the trial transcripts.

¶ 46    "The right to reasonable assistance of postconviction counsel includes the correlative right to conflict-free representation." *People v. Hardin*, 217 Ill. 2d 289, 300 (2005). Where, as here, no claim is made that counsel operated under a *per se* conflict of interest, a defendant must show "that an actual conflict of interest adversely affected counsel's performance." (Internal quotation marks omitted.) *People v. Spreitzer*, 123 Ill. 2d 1, 18 (1988).

"What this means is that the defendant must point to some specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict." *Id.* "[M]ere speculative or hypothetical conflicts are insufficient to demonstrate an actual conflict of interest." (Internal quotation marks omitted.) *People v. Schutz*, 2017 IL App (4th) 140956, ¶ 32.

¶ 47 Ordinarily, a claim of ineffective assistance of counsel is analyzed under the familiar two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). The *Strickland* test requires a defendant to demonstrate both that counsel's performance was deficient and that the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687. However, the *Strickland* court "also noted that there are some circumstances so likely to prejudice the accused that such prejudice need not be shown but instead will be presumed." *People v. Cherry*, 2016 IL 118728, ¶ 25 (citing *Strickland*, 466 U.S. at 692). In *Cronic*, a companion case to *Strickland*, the Supreme Court "explained that prejudice may be presumed where (1) the defendant 'is denied counsel at a critical stage,' (2) counsel 'entirely fails to subject the prosecution's case to meaningful adversarial testing,' or (3) counsel is called upon to represent a client in circumstances under which no lawyer could prove effective assistance." *Id.* (quoting *Cronic*, 466 U.S. at 659-61).

¶ 48 Relevant to the instant appeal is the second *Cronic* exception—that is, the failure to subject the State's case to meaningful adversarial testing. In *Cherry*, 2016 IL 118728, ¶ 26, our supreme court explained just how difficult it is to succeed on this type of claim:

> "In discussing this exception, the Supreme Court has characterized
> it as a 'narrow exception' to *Strickland* that 'infrequently' applies.
> *Florida v. Nixon*, 543 U.S. 175, 190 (2004). Indeed, for this
> exception to apply, it is not enough that counsel failed to oppose

the prosecution 'at specific points' in the proceedings. *Bell v. Cone*, 535 U.S. 685, 697 (2002). Rather, 'the attorney's failure must be complete,' meaning that 'counsel failed to oppose the prosecution throughout the proceeding as a whole.' *Id.* In *People v. Caballero*, 126 Ill. 2d 248 (1989), this court explained that the second *Cronic* exception applies when 'counsel's effectiveness has fallen to such a low level as to amount not merely to incompetence, but to no representation at all.' *Id.* at 267 (citing *Cronic*, 466 U.S. at 659)."

¶ 49 Here, the record clearly contradicts defendant's claim counsel was ineffective under the second *Cronic* exception during posttrial proceedings. As discussed, in order to succeed on such a claim, a defendant must demonstrate that his counsel's effectiveness amounted to no representation at all; it is not enough that counsel merely did not do enough at specific points in the proceedings. See *Cherry*, 2016 IL 118728, ¶ 26. Contrary to defendant's argument, the record here shows counsel (1) filed a "placeholder" motion for new trial; (2) filed an initial motion to continue and, after the State objected, filed a second motion to continue in compliance with section 5-4-3.1 of the Unified Code of Corrections (730 ILCS 5/5-4-3.1 (West 2018)); (3) argued in support of the motion to continue at two separate hearings; and (4) obtained a continuance. Therefore, it cannot be argued that counsel provided no representation at all during posttrial proceedings. We recognize defendant suggests counsel should have done more, either by filing an additional motion to continue or arguing the motion for new trial on file rather than withdrawing it. However, a claim that counsel should have done more is more appropriately raised pursuant to *Strickland*, not *Cronic*.

¶ 50　　　　　　We further reject defendant's claim that counsel provided no representation at all in deciding whether to file an appeal. In advancing this argument, defendant explicitly acknowledges that "on this record, there is no way of knowing if [defendant] elected not to pursue his constitutional right to a direct appeal based on the fully-informed, sound advice of post-conviction counsel." We decline to engage in speculation and therefore do not address this contention further. See, *e.g.*, *People v. Tuduj*, 2014 IL App (1st) 092536, ¶ 102 (stating that claims of ineffective assistance "cannot be based on mere conjecture or speculation").

¶ 51　　　　　　Finally, as noted above, defendant argues in the alternative that reasonable counsel would have also argued the trial court abused its discretion in denying his request for additional time to obtain the trial transcripts. However, the court *granted* defendant's request for a continuance to March 11, 2019. On March 11, defendant did not file a new motion to continue. Thus, the trial court did not deny a request for a continuance, and we reject defendant's argument.

¶ 52　　　　　　　　　　　　　　2. *Expert Witness Testimony*

¶ 53　　　　　　Defendant argues he was denied a fair trial where the State's child-abuse expert, Johanna Hager, was allowed to listen to A.C.'s testimony and then improperly bolstered A.C.'s credibility through her own testimony, thereby impeding the jury's ability to determine witness credibility. Specifically, defendant contends Hager bolstered A.C.'s testimony by providing reasons for A.C.'s late disclosure that were not corroborated by A.C.'s own testimony. Defendant cites to *People v. Simpkins*, 297 Ill. App. 3d 668 (1998), in support of his argument.

¶ 54　　　　　　"Generally speaking, expert testimony will be admitted if the expert has some knowledge or experience, not common to the world, which will aid the finder of fact in arriving at a determination on the question or issue." *People v. Nelson*, 203 Ill. App. 3d 1038, 1042

- 13 -

(1990). Section 115-7.2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.2 (West 2016)) provides that, in a prosecution for violations of certain sex offenses—including predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) and criminal sexual assault (*id.* § 11-1.20(a)(3))—expert witness testimony "relating to any recognized and accepted form of post-traumatic stress syndrome shall be admissible as evidence." This court has held that child sexual abuse accommodation syndrome is a recognized and accepted form of posttraumatic stress disorder. See, *e.g.*, *People v. Dempsey*, 242 Ill. App. 3d 568, 587 (1993). Thus, we have "applied this statute to allow experts to explain or testify with respect to certain symptoms or behavioral characteristics of child victims of sexual abuse ***." *Simpkins*, 297 Ill. App. 3d at 681.

¶ 55        In *Simpkins*, the child victim recanted her allegations that the defendant had sexually abused her. *Id.* at 674. At trial, the State elicited the testimony of a Department of Children and Family Services investigator establishing the child victim had previously told the investigator about the abuse. *Id.* Then, over objection, the investigator was permitted to testify that, "in his experience, recantation occurs in 50% of the cases." *Id.* The investigator further testified that "some of the reasons child victims recant include an unsupportive family and the child feeling blamed for the abusive parent's absence from the family." *Id.* at 683.

¶ 56        On appeal, we held the trial court had abused its discretion in allowing the investigator's testimony regarding recantation by child victims of sexual abuse. *Id.* We reasoned that the investigator's testimony "regarding the frequency of and reasons for recantation" did not aid the jury because "*no* evidence was presented that [the victim] recanted her allegations *** because of an unsupportive family or because she felt like a scapegoat." (Emphasis in original.) *Id.* at 682-83. We also found that the investigator's testimony "severely impinged on the

province of the jury to determine credibility and assess the facts of the case." *Id.* at 682. Finally, we explained the difference between the investigator's improper testimony in that case and otherwise proper testimony regarding symptoms and behavioral characteristics:

> "In essence, [the investigator] was being asked to give his opinion on the believability of *** the child witness in this case. We view testimony regarding symptoms and behavioral characteristics as being different because such testimony does not constitute direct commentary on the child witness' believability. Instead, that testimony constitutes circumstantial evidence—that is, it describes certain behaviors shown by sexually abused children; thus, if other evidence shows the victim in a particular case engaged in those behaviors, a jury could reasonably view that evidence as supporting the State's claim that the child had been sexually abused." *Id.* at 683.

¶ 57 We find defendant's reliance on *Simpkins* misplaced. Here, unlike in *Simpkins*, there *was* evidence to support Hager's testimony regarding delayed reporting. See *People v. Atherton*, 406 Ill. App. 3d 598, 617 (2010) (distinguishing *Simpkins* on the basis "the expert testimony found support in the testimony of the lay witnesses"); see also *People v. Butler*, 377 Ill. App. 3d 1050, 1064 (2007) (same). Hager testified that a common characteristic of child sexual abuse accommodation syndrome is delayed reporting. She further testified a common reason behind children ultimately deciding to disclose abuse is that they feel safer after a change in family circumstances, such as a divorce. A.C. testified defendant and her mother "filed for a separation" in May 2016. Around this time, A.C.'s mother moved out, while A.C. and the other

children remained with defendant. In September of the same year, A.C. moved in with her aunt for a brief period of time and then began living with her mother. A.C. disclosed the abuse in July 2017, when she was living with her mother and no longer living with defendant. We find Hager's testimony found support in A.C.'s testimony. Thus, this situation more closely resembles *Atherton* and *Butler*. Moreover, unlike in *Simpkins*, Hager did not provide statistics regarding the frequency of delayed disclosures. As noted by the State, Hager merely testified to general characteristics of the syndrome. She did not diagnose A.C. or provide any opinion regarding A.C.'s believability. Accordingly, we reject defendant's argument that Hager's testimony impinged on the jury's ability to determine witness credibility.

¶ 58                                3. *Ineffective Assistance at Sentencing*

¶ 59        Finally, defendant argues postconviction counsel operated under an actual conflict of interest and provided unreasonable assistance by failing to argue her own ineffectiveness at sentencing in not objecting to the testimony of "irrelevant witnesses." Specifically, defendant contends counsel should have objected to the testimony of C.P. and M.F., who defendant alleges "were permitted to testify to irrelevant, decades-old occurrences at sentencing."

¶ 60        As previously stated, to prevail on a claim of ineffective assistance of counsel under the two-prong *Strickland* test, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *Cherry*, 2016 IL 118728, ¶ 24. To do so, "the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Id.* Failure to satisfy either prong of the test precludes a finding of ineffectiveness. See *id.*

¶ 61          "The most important factors in determining whether evidence may be considered at a sentencing hearing is that it be both relevant and reliable." *People v. Moore*, 250 Ill. App. 3d 906, 920 (1993). At the sentencing hearing, the parties "are allowed considerable leeway in the presentation of relevant evidence." *People v. Free*, 94 Ill. 2d 378, 426 (1983). Our supreme court has held that "the sentencing judge has discretion to determine whether evidence is relevant and reliable, and that evidence of other criminal conduct has generally been regarded as relevant to the question of the defendant's character." *People v. Hudson*, 157 Ill. 2d 401, 452 (1993).

¶ 62          Here, we find the complained-of testimony by C.P. or M.F. was relevant in sentencing defendant. These witnesses testified that defendant, as an adult, committed sexual offenses against them when they were minors. This evidence of prior criminal conduct was relevant to defendant's character. See *id.* The fact that the conduct occurred approximately 20 years before the sentencing hearing merely went to the weight to be given the evidence. Defendant fails to cite to any authority holding similar testimony should be considered irrelevant or inadmissible. Accordingly, we reject defendant's argument.

¶ 63                              III. CONCLUSION

¶ 64          For the reasons stated, we affirm the trial court's judgment.

¶ 65          Affirmed.