THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SILAS SNEED, Defendant-Appellant.

First District (5th Division)   No. 1—92—1625

Opinion filed August 4, 1995.

Rita A. Fry, Public Defender, of Chicago (Frederick Weil, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Peter

Fischer, and Sang Won Shim, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

After a jury trial defendant Silas Sneed was found guilty of first-degree murder and sentenced to 30 years' imprisonment. Defendant appeals and we affirm.

At trial, Easter Tiney testified that she lived with her family at 1520 West Hastings and that she last saw her son Charlie alive at approximately 3 p.m. on January 6, 1991. Charlie's brother Elijah woke Easter up two hours later and told her that Charlie was lying on the stairs and that he had been shot. Easter ran down to the ninth floor of the building where she saw her son, wearing a white T-shirt and gray jeans, lying facedown on the stairs. Easter identified defendant and his cousin Tony Sneed in court, stating that she knew them because they came to her house practically every day.

Lanette Tiney, Charlie's sister, next testified that at approximately 6 p.m. on January 6, 1991, she was in her bedroom with her brother Charlie and his girlfriend, Dontay. Tina Crawford and Tawana Oliver came to the apartment, asked if Charlie was there, and then spoke with Charlie for a few minutes in his room. About 10 minutes after Tina and Tawana left the apartment, Tony arrived at the apartment. Lanette testified that she did not see a gun in Tony's hand. Charlie and Tony left the apartment together. Approximately 15 minutes later Tommy and Elijah, Charlie's brothers, came to the apartment looking for Charlie. Tommy and Elijah left the apartment but returned soon thereafter and stated that a man told them that a boy in a white T-shirt was lying on the stairs.

Tawana Oliver testified that she and Tina Crawford visited with Charlie at 1520 West Hastings on January 6, 1991, and then went to the lobby, where she saw defendant, Tony and Dwayne Appleton. Tony had a black revolver which he put to Tawana's head and asked if she had seen Charlie. When Tawana said that she had not, the defendant, Tony and Dwayne went up the stairway. Tawana and Tina then went to defendant's house, where they saw defendant out of breath.

Tawana testified that she told Paul Rossi, who said he worked for defendant's attorney, that she did not see defendant in the 1520 West Hasting building but she did see Tony and Dwayne. Tawana testified that she spoke with Rossi twice. The first time, she signed a statement stating that she had seen "Tony Silas, Dwayne Appleton and about ten other boys." The second time Tawana saw Rossi, she signed a statement saying that she "did not see Silas Sneed with Tony,

Dwayne or the other guys." Tawana testified that she meant that she did not see defendant with Tony and Dwayne at defendant's apartment subsequent to seeing them in the 1520 West Hastings building. After learning about Charlie's death, Tawana did not go to the police and tell them that she had seen Tony with a gun.

Catina Crawford (Tina) next testified that defendant was the father of her two children. Tina testified that at approximately 6 p.m. on January 6, 1991, she went with Tawana to Charlie's apartment and, while leaving the apartment, she bumped into a boy named Arthur McFarland. Tina testified that she told a man at the police station that Arthur had a gun. Tina stated that she did not see Tony in the 1520 West Hastings building and that she only told the police that she had seen Tony because the police threatened to slap her or take away her children. Tina testified that on January 8, 1991, she had a conversation with Dwayne and defendant while playing cards and she asked Dwayne if he killed Charlie. According to Tina, Dwayne said, "Yeah, we killed Charlie." Defendant did not respond.

Officer Joel Hernandez testified that on January 9, 1991, he and his partner located defendant and Dwayne Appleton at defendant's grandmother's house. Officer Hernandez asked defendant and Dwayne to come to Area 4, and defendant said that he would be glad to come to the station since Charlie was a friend of theirs and they would like to help.

Detective Rybicki stated that when he questioned defendant at the station, defendant told him that he saw Tony and Charlie fighting, and that Tony shot Charlie on the fourteenth floor of the 1520 West Hastings building. Defendant claimed that he did not know that Tony had a gun until they arrived on the tenth floor of the building.

Assistant State's Attorney Joel DeGrazia read to the jury the statement given to him by defendant. In the statement, defendant stated that on January 6, 1991, at about 6 p.m., he was with Tony and Dwayne when Tony stated that he was in trouble with Leon Vortez because he took Leon's jacket. Tony decided to get Charlie's jacket and give it to Leon so that Leon would no longer be mad at him. Tony asked defendant and Dwayne to help in case Charlie got out of hand. Defendant said that while they were in the lobby, Tony showed him the gun he was going to use to rob Charlie of the coat. Defendant, Dwayne and Tony then went upstairs. Tony knocked on the door and Charlie came out. Charlie and Tony began to fight and Tony pulled the black revolver on Charlie. Defendant said that Charlie had no weapons and that Tony shot Charlie four times. Defendant said that they then all ran home. Defendant saw Tina and Tawana

when he got home and told them he never left his house that evening.

Paul Rossi, an investigator for the public defender's office, testified that Tawana Oliver told him that Tony had put a gun to her head and asked her if she had seen Charlie. When Tawana told him that she had not, Tony left. Tawana signed a statement saying that she saw "Tony Silas, Dwayne Appleton and about ten other boys" in the lobby of 1520 West Hastings. After Rossi realized that he had mistakenly written that Tawana had seen "Tony Silas" in the lobby, Rossi again saw Tawana and had her sign a statement stating that she had not seen defendant with Tony and Dwayne.

Defendant was found guilty of first-degree murder and sentenced to 30 years' imprisonment. Defendant contends on appeal that the trial court erred in: (1) denying his motion to suppress; (2) denying his motion *in limine* seeking to bar use of a delinquency adjudication as impeachment; (3) allowing an admission by codefendant Dwayne Appleton to be introduced as evidence against him; and (4) finding him guilty of murder beyond a reasonable doubt. Defendant also contends that he was denied effective assistance of counsel.

Defendant first contends that the trial court erred in denying his motion to suppress his statement. At defendant's suppression hearing, Officer Joel Hernandez testified that on January 9, 1991, he was working in the area of the 1400 block of 13th Street when he encountered defendant and Dwayne Appleton on the street sometime between 10 and 11 a.m. Officer Hernandez spoke with defendant and Dwayne for about 5 to 10 minutes about Charlie Tiney's murder. Silas' grandmother was present during the entire conversation. At some point during the conversation, Officer Hernandez suggested that they continue the conversation in the officer's unmarked police car because it was cold outside. Silas, his grandmother, and Dwayne entered the police car and had a brief conversation with Officer Hernandez. Silas, his grandmother and Dwayne then exited the police car and entered an apartment building down the street. Officer Hernandez then called Detective Rybicki at the police station and was told to bring Silas and Dwayne to the station. Officer Hernandez went to the apartment building which he had seen Silas and Dwayne enter and located the boys at defendant's grandmother's apartment. Officer Hernandez spoke with Silas, Silas' grandmother and Dwayne and asked whether the boys would be willing to come to Area 4 and provide the detectives with information on Charlie's murder. Defendant and Dwayne said "that they would be willing to try to catch the guys that did the shooting." The boys rode with Officer Hernandez to Area 4 in the police car. They arrived at the station just before noon.

Officer Hernandez testified that he never saw anybody at the station hit defendant.

Once at the station, defendant was interviewed by Detective Rybicki. Detective Rybicki testified that defendant's stepfather, Richard Vortez, was at the station providing information on Charlie's murder and was informed that defendant was also at the station helping the police with the murder investigation. Vortez stated that was fine with him and left the station. Vortez did not ask to see defendant. Detective Rybicki spoke with defendant and then Dwayne and Tony Sneed. Defendant was left alone in the interview room for several hours. Detective Rybicki told defendant that he could stay and help with the investigation or go home. It was defendant's option. Defendant was given his *Miranda* warnings, informed that he could be tried as an adult and arrested at 8:30 p.m. Defendant acknowledged that he understood his rights. A youth officer was then contacted, but he did not arrive until a few hours later. Detective Rybicki did not hit defendant nor did he see anyone else hit defendant.

Assistant State's Attorney DeGrazia testified that he gave defendant his *Miranda* warnings before interviewing him on January 9, 1991. Defendant said that he wished to waive his rights and talk about the case. DeGrazia wrote down a summary of what defendant said. Defendant never told DeGrazia that he had been physically abused by police officers, and DeGrazia did not see anyone abuse defendant. Defendant never said that he wanted to contact his parents.

Youth officer Robert Troika testified that when he saw defendant on January 19, 1991, defendant was not crying, appeared to be in good physical condition, did not complain of being tired, showed no signs of physical abuse and did not complain of any mistreatment. Officer Troika heard defendant being given his *Miranda* warnings.

Yvonne Sneed, defendant's mother, testified that defendant was 16 years old on January 10, 1991. Yvonne testified that she did not receive any telephone calls from police officers or the youth officer on January 9 or 10, 1991. She also stated that Richard Vortez is neither defendant's legal guardian nor natural parent. Yvonne testified that she knew defendant was in the police station on January 9, 1991, because Vortez told her that defendant was there for a homicide investigation. She called the police station at approximately 3:30 p.m., and the police told her that defendant was free to leave when the officer got through with him. Yvonne did not go to the police station.

Richard Vortez next testified that he saw defendant at the police station on January 9, 1991. Vortez testified that when he tried to speak with a detective, he was locked in a room. He looked into an-

other room and saw defendant "locked against the wall." According to Vortez, defendant looked as if he had been crying. Vortez said that the room he was in did not have any windows, but he saw defendant through a glass on the wall.

At the conclusion of this evidence, the trial court granted defendant's motion to suppress. The trial court noted that there was no evidence of any police misconduct, beatings, threats of intimidation or coercion, but that defendant's statement should be suppressed on the basis that defendant's *Miranda* waiver was not knowing and intelligent since he had not been informed that he could be charged as an adult.

The State filed a motion to reconsider, asking the court for permission to reopen its case to introduce evidence of defendant's criminal background. Defendant did not object to the State's motion to reopen, and the trial court exercised its sound discretion in permitting the State to reopen its case and allow in new evidence.

During the new suppression hearing, it was stipulated that if Carol Slaughter were called to testify, she would testify that she is employed by the Cook County State's Attorney at the juvenile division and is responsible for maintaining records for juveniles. She would present certified copies of defendant's juvenile criminal records which showed that defendant had been arrested eight times between November 1987 and January 1990.

After considering this evidence, the trial court reversed its ruling and denied defendant's motion to suppress his statement. The court explained that when it made its initial ruling, it was unaware of defendant's juvenile background and, while his background was not controlling, it was a factor to consider in its determination that defendant knowingly and intelligently waived his *Miranda* rights. The court also stated that the testimony revealed that defendant had been informed that he could be tried as an adult.

Defendant points out that when the evidence was reopened, no evidence was adduced as to whether defendant was informed that he could be tried as an adult. Our review of the record does reveal, however, that at the original suppression hearing, testimony was in fact introduced that defendant was informed that he could be tried as an adult. The trial court, in making its ruling, was entitled to review not only the testimony that had been introduced after the case had been reopened, but also the testimony from the original suppression hearing.

■ A valid *Miranda* waiver requires both a free, uncoerced choice and an awareness of the right and the consequences of abandoning it. (*People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958.) With re-

spect to voluntariness, confessions by juveniles are generally subjected to the same scrutiny as confessions of adult defendants. (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371.) The test is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement of any sort, with consideration given to the characteristics of the accused as well as the details of the interrogation. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) The receiving of an incriminating statement by a juvenile is a sensitive concern requiring great care, in the absence of counsel, to assure that the juvenile's confession was neither coerced or suggested, nor the product of fright or despair. (*Prude*, 66 Ill. 2d at 476.) A reviewing court will not disturb the ruling of a trial court on a motion to suppress unless the decision is against the manifest weight of the evidence. *People v. Holloway* (1981), 86 Ill. 2d 78, 426 N.E.2d 871.

■ We do not find the trial court's decision that defendant's *Miranda* waiver was knowing and intelligent to be against the manifest weight of the evidence. Defendant was given his *Miranda* warnings on several occasions and indicated that he understood these warnings. Defendant was informed that he could be charged as an adult. Although defendant was 16 years old at the time of his arrest, there is nothing in the record to indicate that he was of less than normal intelligence. Furthermore, defendant had been arrested on numerous occasions and had been adjudicated delinquent on one occasion. We agree with the trial court that while defendant's previous encounters with the police are not dispositive, they may certainly be considered in determining whether defendant knowingly and intelligently waived his right to remain silent and voluntarily confessed. (See *Prude*, 66 Ill. 2d 470, 363 N.E.2d 371; *In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *overruled on other grounds People v. R.D.* (1993), 155 Ill. 2d 122, 613 N.E.2d 706.) We do not condone the officers' behavior in conducting a lengthy interrogation of a minor without notifying the minor's legal guardian. Nonetheless, under the circumstances here, we do not believe the trial court's decision denying defendant's motion to suppress was against the manifest weight of the evidence.

Defendant next contends that the trial court erroneously denied his motion *in limine* to bar the use of a prior delinquency adjudication as impeachment. Defendant moved to bar the use of his juvenile adjudication for criminal sexual assault in 1989 as impeachment of his testimony. When the court denied the motion, defendant moved to keep the nature of the offense from the jury, but this motion was also denied. Defendant did not testify at trial.

■ Federal Rule of Evidence 609(d), as adopted in *People v. Montgomery* (1971), 47 Ill. 2d 510, 517, 268 N.E.2d 695, states that:

> " '(d) Juvenile Adjudications. Evidence of juvenile adjudications is generally not admissible under this rule. The judge may, however, allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the judge is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.' "

While Rule 609(d) gives the court discretion to admit evidence of a juvenile adjudication to impeach a witness, there is no such discretion when the witness is the accused in a criminal case. When the witness is the accused, Rule 609(d) prohibits admission of juvenile adjudications for impeachment. (*People v. Kerns* (1992), 229 Ill. App. 3d 938, 595 N.E.2d 207.) The trial court therefore erred in denying defendant's motion *in limine* which sought to bar the admission of evidence regarding defendant's juvenile adjudication. We find any error harmless, however, in light of defendant's confession.

Defendant next contends that an admission by codefendant Dwayne Appleton was erroneously admitted into evidence. Tina Crawford testified that on January 8, 1991, she was playing cards with defendant and Dwayne Appleton when she asked Dwayne if he killed Charlie Tiney. Dwayne replied, "Yeah, we killed Charlie" and he laughed. Tina testified that defendant did not say anything. Tina said Dwayne "was playing" and joking, and she did not take him seriously. However, when the police took Tina's statement, she did not tell them that Dwayne was joking when he made the comment about killing Charlie.

■ The silence of the defendant may be introduced as a tacit or implied admission of guilt if the defendant remains silent in the face of an accusation of criminal conduct. (*People v. Miller* (1984), 128 Ill. App. 3d 574, 470 N.E.2d 1222.) When an incriminating statement is made in the presence and hearing of the accused, and the accused fails to deny, contradict, or object to the statement, both the statement and the fact that the accused failed to deny the statement are admissible as evidence of his acquiescence in its truth. (*Miller*, 128 Ill. App. 3d at 583.) In order to qualify as an admission by silence or implied admission, it is essential that: (1) the accused heard the incriminating statement; (2) the incriminating statement was made under circumstances which allowed an opportunity for the accused to reply; and (3) a person similarly situated would ordinarily have denied the accusation. *People v. Cihak* (1988), 169 Ill. App. 3d 606, 523 N.E.2d 975.

■ The conversation in question occurred while Tina, defendant and Dwayne were playing cards. Thus, it is likely that defendant heard the conversation between Tina and Dwayne and that defendant had an opportunity to reply. However, it is questionable whether a person similarly situated would have responded to Dwayne's comment, particularly if Dwayne appeared to be joking when he made the comment. Furthermore, Tina asked Dwayne whether *he* killed Charlie. Dwayne responded that *we* killed Charlie. We cannot clearly adduce from that statement that Dwayne was referring to defendant. It is, however, our opinion that if there was any error in admitting this conversation, it was harmless in light of defendant's confession that he was with Tony and Dwayne when the murder occurred.

Defendant next contends that he was denied effective assistance of counsel. To sustain a claim of ineffective assistance of counsel, defendant must prove that (1) his counsel's errors were so serious and his performance so deficient that he was not functioning as "counsel" guaranteed by the sixth amendment to the United States Constitution; and (2) these deficiencies so prejudiced the defendant as to deprive him of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.

■ Defendant complains that his counsel failed to ask the police officers whether they were familiar with the provisions of the juvenile code governing the handling of minors taken into custody by police. Because defense counsel elicited testimony that a youth officer was not contacted until after defendant was interviewed, defendant could have suffered no prejudice from his attorney's failure to specifically ask about the juvenile code. As for defendant's complaint that his counsel failed to ask the detectives and the State's Attorney whether defendant had been offered food and water, the use of the bathroom or an opportunity to sleep, it appears from the record that these subjects were in fact raised at least to some extent by defense counsel.

Defendant next takes issue with his counsel's failure to object during the hearing on the motion to suppress when the State sought to reopen its case to introduce evidence of defendant's juvenile background. However, the decision to reopen a case is within the trial court's discretion, and even if an objection had been made, the trial court's decision allowing the State to reopen its case was not an abuse of its discretion.

Defendant next complains of his counsel's failure to allege in the motion to suppress that defendant's statement was the product of an illegal arrest. We do not believe that the facts support a finding of il-

legal arrest. When the police officer initially encountered the defendant on the street, defendant was in the presence of his grandmother and another youth. After speaking with the officer for a few minutes, defendant was allowed to leave. When the officer approached defendant again, he spoke with defendant and defendant's grandmother and defendant voluntarily consented to accompany the officer to the police station in order to help the detectives with the murder investigation. Once at the station, defendant was told that he could remain at the station and help with the investigation or he could go home. Defendant was told that it was his option. It is therefore clear that defendant suffered no prejudice from his counsel's failure to allege that defendant's arrest was illegal.

Defendant next claims that his counsel should have called codefendant Tony Sneed's alibi witnesses to establish that defendant could not be accountable for Tony's act since Tony could not have committed the acts. However, in light of defendant's confession, it is unlikely that the calling of these witnesses would have altered the jury's verdict. Therefore, we do not believe that defendant received ineffective assistance of counsel.

■ Defendant's last contention is that the evidence was insufficient to prove his guilt of first-degree murder beyond a reasonable doubt. We disagree. The relevant question is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) We find that the evidence here, particularly defendant's confession, when viewed in the light most favorable to the prosecution, shows that a rational jury could have found defendant guilty of murder.

Accordingly, for the reasons set forth above, defendant's conviction is affirmed.

Affirmed.

GORDON and T. O'BRIEN, JJ., concur.