No. 3--05--0724

Filed August 15, 2007.

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois |
| Plaintiff-Appellee, | ) ) | No. 04-CF-897 |
| v. | ) ) | |
| MARTEZ HARRIS, | ) ) | Honorable James E. Shadid, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CARTER delivered the opinion of the court:

After a jury trial, defendant, Martez Harris, was found guilty of armed robbery (720 ILCS 5/18-2(a)(2) (West 2004)) and was sentenced to 24 years' imprisonment. Defendant appeals his conviction and sentence and argues that: (1) he was denied a fair trial when the State improperly impeached him in rebuttal with a certified copy of one of his prior juvenile adjudications; and (2) the trial judge erred in sentencing by considering unreliable hearsay testimony regarding defendant's involvement in other criminal activity. We affirm.

FACTS

Defendant was charged with the August 23, 2004, armed robberies of Steve Johnson (count one) and Mary Helms (counts two and three). The indictment alleged that the defendant committed

the offenses while armed with a handgun. The case proceeded to jury trial three times. The first two times ended in a mistrial after the jury was unable to reach a unanimous verdict.

The evidence presented in the third trial, relevant to this appeal, can be summarized as follows. On August 23, 2004, at about 1:00 a.m., Sparky's Ringside Tap in Peoria was robbed. At the time of the robbery, Steve Johnson was working in the bar as the bartender. The lights were on and Johnson had just closed the bar for the evening. Mary Helms was inside the bar visiting with Johnson and was the only other person in the bar. A short, stocky male black subject with frizzy hair and wearing a puffy black winter coat came into the bar. The subject appeared to be about 20 years old. Johnson went up to the subject to tell him that the bar was closed. A second subject came into the bar behind the first. The second subject had a mask on his face and a gun in his hand. Johnson yelled to Helms that the bar was being robbed and told her to duck and run. Johnson and Helms ran out of the back door of the bar and away from the area and called the police.

On the witness stand, both Johnson and Helms identified defendant as the first subject who had entered the bar. Helms testified further that after she ran out of the bar, she saw defendant, the subject wearing the mask, and a third subject running away from the bar. Defendant was carrying Helms's purse and the subject wearing the mask was carrying the cash register from the bar.

Defendant denied committing the armed robbery. During his direct testimony, defendant was specifically asked by his attorney if he committed the crime. Defendant responded:

"No sir. There is no possible way that I could have committed this crime. I mean people who commit robberies, things like that, have a motive, have a reason for doing things like that. But I am a professional man. I work. I go to college. I went to Robert Morris,

2

ICC, Midstate. I mean, it's no reason--I mean I live a productive life.

I live just like any of the 12 jurors, like you live. I don't commit

crimes."

In rebuttal, the prosecutor sought to introduce evidence of defendant's prior juvenile adjudications for aggravated battery with a firearm, aggravated discharge of a firearm, theft, and possession of a controlled substance. The aggravated battery and aggravated discharge were committed in August of 2000, about one month before defendant's 16th birthday. Sentence was entered in February of 2001 and was upheld by the appellate court. The theft adjudication occurred in 1997 and the unlawful possession of a controlled substance adjudication occurred in 1998 and again in 2000. All five offenses were felonies. The prosecutor argued that defendant had made a false statement and had presented a false portrayal of himself when he told the jury that he does not commit crimes.

The trial judge initially denied the prosecutor's request. However, upon reconsideration, the trial judge granted the prosecutor's request, in part, and decided to allow the prosecutor to impeach defendant's testimony with his prior juvenile adjudication for aggravated battery with a firearm and aggravated discharge of a firearm finding that the admission was "necessary for a fair determination on the issue of guilt or innocence in this case". Defense counsel objected and argued that under the test set forth in People v. Montgomery, 47 Ill. 2d 510, 516-519, 268 N.E. 2d 695, 698-700 (1971), the prior adjudications were too prejudicial to be admitted because of their similarity to the current offense in that the prior offenses and the current offense each involved the use of a gun. The trial judge overruled defense counsel's objection, and in doing so, made the following comments:

"Well, Montgomery requires me to determine that the probative value

3

is not outweighed by the danger of unfair prejudice, and certainly there is some prejudice here. Certainly there is prejudice anytime a prior conviction is brought in as to a witness or a Defendant. In this case I understand your point, [defense counsel], that there is a gun case, that aggravated discharge of a firearm is a gun charge, armed robbery is completely different elements and circumstances, but the Court also cannot overlook the Defendant's testimony that I don't commit crimes as being factored in here. This came up during direct examination. So when weighing the whole, when given the weight and weighing all the factors that I need to weigh, I am going to allow the most recent, the 2000 case ***."

A certified copy of the 2000 adjudication was admitted into evidence and the trial judge informed the jury that the exhibit indicated that defendant had been adjudicated a delinquent for aggravated battery with a firearm and aggravated discharge of a firearm in a juvenile case in February of 2001. Immediately after admitting the prior juvenile adjudication, the trial judge instructed the members of the jury that "evidence of Defendant's previous juvenile adjudication may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense for which he is charged."

During the instruction phase of the trial, the jury was given a modified version of IPI 3.13 (Illinois Pattern Jury Instruction, Criminal, No. 3.13 (4th ed. 2000)), which read as follows:

"Evidence of a defendant's previous juvenile adjudication(s) may be considered by you only as it may affect his believability as a witness

4

and must not be considered by you as evidence of his guilt of the offense with which he is charged."

After deliberation, the jury found defendant guilty of all three counts of armed robbery. The matter was set for sentencing and a presentence investigation report (PSI) was ordered. The PSI provided further detail on defendant's juvenile record. Only the major offenses are described below.

In June of 1997, defendant was adjudicated delinquent for theft, a Class 3 Felony. The offense occurred in October of 1996. Defendant was sentenced to two years probation in July of 1997. In March of 1998, a petition was filed alleging that defendant had violated his sentence by failing to report to probation. During the pendency of the petition, defendant was placed on electronic monitoring. A warrant was issued for defendant's arrest for violation of home detention. Probation was revoked, and in July of 1998, defendant was sentenced to a new term of probation and to a 30 day period of home detention.

In December of 1998, defendant was adjudicated delinquent for unlawful possession of a controlled substance, a Class 4 Felony. The offense occurred in November of 1998. Defendant was sentenced to three years in the juvenile Department of Corrections. In May of 1999, defendant was put on parole. In June of 1999, defendant was returned to the Department of Corrections on a parole violation and a new offense.

In May of 2000, defendant was adjudicated delinquent for unlawful possession of a controlled substance, a Class 4 Felony. The offense occurred in October of 1999. Defendant was sentenced to three years in the juvenile Department of Corrections in May of 2000. He was paroled in June of 2000. In August of 2000, defendant was returned to the Department of Corrections on a parole violation. Defendant's sentence was later discharged while he was serving a term in juvenile

Department of Corrections on another case.

In January of 2001, defendant was adjudicated delinquent for aggravated battery with a firearm, a Class X Felony, and for unlawful discharge of a firearm, a Class 1 Felony. The offenses occurred in August of 2000. In February of 2001, defendant was sentenced to an indeterminate term in the juvenile Department of Corrections. He was paroled in January of 2002. In October of 2002, defendant was returned to the Department of Corrections on a parole violation. Defendant was again paroled later that same month. Defendant was returned to the Department of Corrections in July of 2003 on a parole violation. In September of 2003, defendant was again paroled. Defendant was discharged from his sentence in May of 2004.

Other notable offenses listed in the PSI are as follows. In June of 1998, defendant pled guilty to fleeing and attempting to elude a police officer and was ordered to pay fines and costs. The defendant's driver's license was subsequently suspended. In April of 2004, defendant pled guilty to driving on a suspended license and was sentenced to court supervision. His supervision was later revoked for subsequent offenses, and a conviction was entered. In September of 2004, defendant was convicted of two separate incidents of driving on a suspended license. He was ordered to pay costs and sentenced to 30 days in jail.

At the sentencing hearing, the prosecutor and defense counsel agreed that sentence should only be imposed on one of the three counts of armed robbery. In aggravation, the prosecutor called Detective Shannon Walden to the stand. Walden was assigned to investigate three other armed robberies that occurred in Peoria at about the same time as the one in the current case. All of the robberies, including the one in the current case, occurred within approximately one week during the early morning hours and involved subjects wearing masks and carrying handguns.

6

One of the other robberies that Walden investigated occurred on August 23, 2004, at 4:00 a.m. at the King's Inn Hotel. The attendant working the hotel at the time of the robbery stated that two black male subjects came into the hotel wearing masks. The attendant described one of the subjects as being shorter and wearing a black puffy winter coat, similar to the description that was given of the defendant in the present case. The subjects forced the attendant to lay on the floor while they ransacked the office. The attendant thought he recognized the short male's voice as someone who had rented a room at the hotel on several prior occasions and thought that the subject's name was Martez or Martinez. The attendant checked the hotel records and found that defendant had rented from him several times and that defendant was the person of whom he was thinking. The attendant identified a picture of defendant as the person who had rented from him several times whose voice he thought he recognized.

Walden testified further that he interviewed Andre Bowie regarding his involvement in the robberies and Bowie gave a statement implicating defendant in the King's Inn robbery. Bowie stated that defendant told him that he had committed the robbery with Antwoin Harris and that he was a little bit worried because he thought that the attendant at the hotel might have recognized his voice since he had rented a room there several times in the past.

Walden also was involved in the investigation of the Best Western armed robbery that occurred on August 24, 2004, at about 6:00 a.m. In that case, the attendant stated that two male subjects came into the hotel wearing masks and forced her into a back room where they tied her up. One of the subjects was taller and one was shorter. The subjects appeared to be in their late teens or early twenties. The two subjects ransacked the office area, put a safe up on a chair, and wheeled it out. A maintenance person and customers who happened upon the robbery as it was in progress

7

were also forced to the back room at gunpoint. At one point during the robbery, the shorter subject ripped a key box off of the wall and threw it over to the taller subject.

Bowie's fingerprints were found on the key box. Bowie admitted to Walden that he was the person that the key box was thrown to and told Walden that defendant was the other person involved in the robbery. Bowie's statement to Walden was consistent with what the victims of the Best Western robbery had also told Walden.

Walden was also involved in the investigation of the Clark Gas Station armed robbery that occurred on August 29, 2004, at about 3:00 a.m. In that case, the clerk stated that two male subjects came into the gas station and that one of the subjects was wearing a mask. A short while later, a third subject came in. All three subjects were brandishing guns. They forced the clerk down on the ground and stole cigarettes, lottery tickets, and the surveillance video recorder, and then ran out of the station and left in a car. The clerk called the police and gave a description of the car. The police located the car and gave chase. A license plate check revealed that the vehicle belonged to Debra Smullen. The officers giving chase stated that a white female was driving the car and that there were three black males inside the vehicle. The chase was eventually called off for safety reasons. The vehicle was later found abandoned with the video recorder and some of the other proceeds of the robbery and a ski mask still inside. A canine officer was able to track from the vehicle and found two handguns that had been dropped. Fingerprints found on the video recorder and on the trunk area were identified as Bowie's. Defendant's fingerprints were found on the rear driver's side door. The clerk later identified Antwoin Harris as one of the subjects that was involved in the robbery, the one that wasn't wearing a mask. Smullen and Bowie both gave videotaped statements in which they implicated themselves and the defendant. The videotapes were played during the sentencing hearing.

8

Bowie and Smullen's statements were consistent with how the clerk described the robbery and consistent with the video captured by a second surveillance recorder that was located in the gas station.

On cross examination, Walden testified that defendant was arrested for the three other robberies, but that no charges had been filed. Walden admitted that he was not present when Smullen was interviewed and that he had only reviewed the videotape.

The defense presented no evidence in mitigation. The prosecutor recommended that defendant be sentenced to 24 years' imprisonment, largely because of the nature of the current offense, the number and nature of his previous offenses, and the need to protect the public. Defense counsel recommended a range of sentence more towards the minimum of six years' imprisonment.

In determining the length of imprisonment to impose, the trial judge found that none of the factors in mitigation applied. As for the statutory factors in aggravation, the trial judge found that defendant had a history of prior delinquency or criminal activity and that the sentence was necessary to deter others from committing the same crime. The trial judge noted that although defendant was young, he had accumulated quite a record for himself in such a short period of time. In regards to the evidence presented that defendant was involved in other robberies, the trial judge stated:

> "[Defense counsel] points out *** you shouldn't be sentenced for four armed robberies, which the Court is not sentencing him for, [defense counsel], but it is relevant to determine the character and extent of punishment. The Court is not limited to considering only information which would be admissible under adversarial circumstances of a trial, but I will exercise care to ensure that the

9

information was reliable, and I believe that the information was reliable based upon the testimony of Detective Walden, and it is permissible to look for facts in addition to the facts of the crime, search anywhere within reasonable bounds for other facts which tend to aggravate or mitigate the offense and may indicate the defendant's general moral character, habits, social environment, aversion or inclination to commit crime. Motivations, for example, would be admissible, would be relevant inquiry, and that's what the Court will base some of the information presented on under the--under that relevant inquiry."

The trial judge subsequently sentenced defendant to 24 years' imprisonment. In imposing sentence, the trial judge commented:

"Your actions and your criminal activity disrupt people's lives from going about their daily business which they should be able to go about freely and without looking over their shoulder, and without the thought or the fear of someone sticking them up, and it just comes down to that."

This appeal followed.

## ANALYSIS

As his first contention on appeal, defendant argues that he was denied a fair trial when the State improperly impeached him in rebuttal with a certified copy of one of his prior juvenile

10

adjudications.  The State argues that defendant opened up the door to the subsequent impeachment by testifying in direct examination that he does not commit crimes.  We will not disturb a trial judge's decision to allow impeachment with a prior conviction absent an abuse of discretion.  People v. Flowers, 306 Ill. App. 3d 259, 264, 714 N.E. 2d 577, 581 (1999).

A juvenile adjudication is generally not admissible to impeach a defendant's credibility. People v. Montgomery, 47 Ill. 2d 510, 517, 268 N.E. 2d 695, 699 (1971).  This general principle regarding the inadmissibility of juvenile adjudications protects individuals from the indiscretions of youth.  See G. O'Reilly, Illinois Lifts the Veil On Juvenile Conviction Records, 83 Ill. B.J. 402, 403 (1995).  However, when an adult defendant takes the stand and testifies falsely or inconsistently or presents a false or misleading portrayal of himself to the jury, the juvenile adjudication may become admissible, in the trial judge's discretion, for the limited purpose of impeaching that testimony.  This is so,  not simply because of the notion of curative admissibility or because the defendant "opened up the door" to the subsequent impeachment, but rather, because the integrity of the entire judicial process depends upon it.  A defendant who takes the stand has an obligation to speak truthfully and accurately.  Harris v. New York, 401 U.S. 222, 225, 28 L. Ed. 2d 1, 4, 91 S. Ct. 643, 645-646 (1971). There is no right to testify falsely.  See Harris, 401 U.S. at 225-226, 28 L. Ed. 2d at 4-5, 91 S. Ct. at 645-646.  A defendant cannot be allowed to use the policy-based prohibition against the admission of a juvenile adjudication as a license to provide false testimony to the jury.  See Harris, 401 U.S. at 225-226, 28 L. Ed. 2d at 4-5, 91 S. Ct. at 645-646.  In fact, even where a much stronger prohibition exists, a constitutional one, the United States Supreme Court has recognized that the State may have a right to admit prohibited evidence to impeach a defendant's false or inconsistent testimony.  See Harris, 401 U.S. at 225-226, 28 L. Ed. 2d at 4-5, 91 S. Ct. at 645-646 (statement

11

taken in violation of Miranda allowed to be used in cross examination to impeach defendant's testimony); Oregon v. Hass, 420 U.S. 714, 722-724, 43 L. Ed. 2d 570, 577-578, 95 S. Ct. 1215, 1221 (1975) (statement taken in violation of Miranda allowed to be used in rebuttal to impeach defendant's testimony) United States v. Havens, 446 U.S. 620, 627-629, 64 L. Ed. 2d 559, 566-567, 100 S. Ct. 1912, 1916-1917 (1980) (evidence obtained in violation of Fourth Amendment allowed to be admitted in rebuttal to impeach defendant's testimony); Michigan v. Harvey, 494 U.S. 344, 345-346, 108 L. Ed. 2d 293, 299, 110 S. Ct. 1176, 1177-1178 (1990) (statement taken in violation of Sixth Amendment allowed to be used in cross examination to impeach defendant's testimony).

Our supreme court has adopted and applied the rule set forth in Harris v. New York. See People v. Sturgis, 58 Ill. 2d 211, 216, 317 N.E. 2d 545, 548 (1974); People v. Rosenberg, 213 Ill. 2d 69, 80, 820 N.E. 2d 440, 447-448 (2004). Thus, it can be concluded on the facts of the present case that defendant's prior juvenile adjudication was properly admitted as an exercise of judicial discretion. See Harris, 401 U.S. at 225, 28 L. Ed. 2d at 4-5, 91 S. Ct. at 645-646; Hass, 420 U.S. at 722-724, 43 L. Ed. 2d at 577-578, 95 S. Ct. at 1221; Havens, 446 U.S. at 627-629, 64 L. Ed. 2d at 566-567, 100 S. Ct. at 1916-1917; Harvey, 494 U.S. at 345-346, 108 L. Ed. 2d at 299, 110 S. Ct. at 1177-1178; Sturgis, 58 Ill. 2d at 216, 317 N.E. 2d at 548; Rosenberg, 213 Ill. 2d at 80, 820 N.E. 2d at 447-448. Defendant took the stand and made false statements on direct examination, arguably attempting to portray himself and his character in a false manner. Had defendant not done so, the prior juvenile adjudication would not have been admissible. See Montgomery, 47 Ill. 2d at 517, 268 N.E. 2d at 699.

We are not persuaded by defendant's alternative argument that the prior juvenile adjudication

12

should not have been admitted because its probative value was outweighed by its prejudicial effect. It's clear from the record that the trial judge weighed the probative value and the prejudicial effect in determining the admissibility of the prior adjudication. As a result of that balancing test, the trial judge ruled that only the most recent adjudication would be admissible and prohibited the State from introducing defendant's other prior juvenile adjudications. In making that ruling, the trial judge considered the general prohibition against admitting a juvenile adjudication to impeach a defendant's testimony and also considered the harm that would result from allowing defendant's false portrayal to stand. The trial judge's ruling struck a careful balance between the two competing concerns. The admission of the juvenile record as rebuttal evidence was not prejudicial error where the defendant himself raised the issue of his character and past behavior. See People v. Williams, 192 Ill. 2d 548, 571, 736 N.E. 2d 1001, 1014 (2000) (a criminal defendant cannot complain on appeal of the introduction of evidence which he procures or invites).

Nor are we persuaded by defendant's contention that the proper recourse was to allow the State to question defendant in cross examination about his prior juvenile record, rather than to allow the State to introduce a certified a copy of the prior adjudication. The recourse suggested by defendant here on appeal is far more prejudicial than the course of action chosen by the trial judge and would have possibly subjected defendant to a broad inquiry regarding his prior juvenile history. The trial judge properly exercised his discretion.

It need not be determined whether in this context, the Montgomery test must be followed or whether the Harris v. New York rule and the Montgomery test should be combined into a single rule. It is clear from the record before us that the trial judge followed Montgomery and the parties do not argue that issue here. Further examination of that issue is better left to be resolved when the facts

13

give rise to the issue and the parties have briefed and argued the issue. For the purposes of this case, defendant's affirmative resort to false or misleading testimony allows for exposure by impeachment. Thus, we decline to exclude that impeachment under Montgomery.

It is recognized that this decision on the first issue is directly contrary to that of other districts of the appellate court, which have held that a defendant's prior juvenile adjudications may never be admitted under Montgomery. See People v. Kerns, 229 Ill. App. 3d 938, 940-941, 595 N.E. 2d 207, 208-209 (1992); People v. Sneed, 274 Ill. App. 3d 287, 295, 653 N.E. 2d 1349, 1355 (1995); People v. Massie, 137 Ill. App. 3d 723, 731, 484 N.E. 2d 1213, 1218-1219 (1985). Such a rule, however, cannot be reconciled with Harris v. New York. It is also recognized that the rationale that is applied in this opinion differs from the rule applied in the appellate districts that allow a prior juvenile adjudication to be admitted. See People v. Bunch, 159 Ill. App. 3d 494, 513, 512 N.E. 2d 748, 761 (1987) (prior juvenile adjudication admitted as impeachment evidence where defendant "opened up the door" to the subsequent impeachment by testifying in direct examination about some aspect of his criminal record). The Harris v. New York rule provides much stronger support for a trial court's decision to allow the impeachment of a defendant with his prior juvenile adjudication and has been adopted by our supreme court. See Sturgis, 58 Ill. 2d at 216, 317 N.E. 2d at 548; Rosenberg, 213 Ill. 2d at 80, 820 N.E. 2d at 447-448.

As his second contention on appeal, defendant argues that the trial judge committed an abuse of discretion in determining the appropriate sentence by placing significant weight on the unreliable hearsay testimony of Detective Walden regarding defendant's involvement in other criminal activity. Defendant asserts that the proper method of proving those matters up at sentencing is to have the witnesses who have personal knowledge of the events testify, rather than to have the investigating

14

officer testify about what the witnesses told him.

It is well settled that the ordinary rules of evidence which govern at trial are relaxed at the sentencing hearing. People v. Jett, 294 Ill. App. 3d 822, 830, 691 N.E.2d 145, 152 (1998). Instead, a sentencing court is given broad discretionary power to consider various sources and types of information so that it can make a sentencing determination within the parameters outlined by the legislature. People v. Williams, 149 Ill. 2d 467, 490, 599 N.E. 2d 913, 924 (1992). The court may search anywhere within reasonable bounds for other facts which may serve to aggravate or mitigate the offense. People v. Moore, 250 Ill. App. 3d 906, 919, 620 N.E. 2d 583, 592 (1993). It may inquire into a defendant's general moral character, habits, social environment, abnormal tendencies, age, natural inclination or aversion to commit crime, and stimuli motivating his conduct, in addition to his family life, occupation, and criminal record. Moore, 250 Ill. App. 3d at 919, 620 N.E. 2d at 592. Thus, criminal conduct not resulting in prosecution or conviction may be considered. People v. Hudson, 157 Ill. 2d 401, 452, 626 N.E. 2d 161, 183 (1993). Even conduct for which defendant has been acquitted may be considered. People v. Robinson, 286 Ill. App. 3d 903, 910, 676 N.E. 2d 1368, 1373 (1997).

The only requirement for admission of evidence in a sentencing hearing is that the evidence must be reliable and relevant as determined by the trial court within its sound discretion. Jett, 294 Ill. App. 3d at 830, 691 N.E.2d at 152. Thus the mere fact that the testimony presented contains hearsay does not make it per se inadmissible nor does it deny the defendant his right to confront witnesses. People v. Perez, 108 Ill. 2d 70, 86, 483 N.E. 2d 250, 258 (1985). A hearsay objection affects the weight rather than the admissibility of the evidence. Jett, 294 Ill. App. 3d at 830, 691 N.E.2d at 152. Hearsay evidence may be found to be relevant, reliable, and admissible when it is

15

corroborated by other evidence. Jett, 294 Ill. App. 3d at 830, 691 N.E.2d at 152. A sentencing court, however, must exercise care to insure the accuracy of information considered and to shield itself from what might be the prejudicial effect of improper materials. Williams, 149 Ill. 2d at 490, 599 N.E. 2d at 924. If it is shown that the defendant has been prejudiced by the procedure adopted or by the material considered by the trial court in conducting its inquiry, the resultant penalty will not be allowed to stand. People v. Crews, 38 Ill. 2d 331, 337-338, 231 N.E. 2d 451, 454 (1967).

The instant defendant would have this Court adopt a rule which would require the State to call all of its witnesses to defendant's other criminal activity to prove up the other crime at sentencing, essentially holding a mini-trial on the other crime at the sentencing hearing. However, our supreme court has consistently upheld the method used by the State in the present case. See Perez, 108 Ill. 2d at 85-88, 483 N.E. 2d at 257-259 (allowing correctional officer's testimony that his superior told him that another inmate had told superior that something could possibly happen to officer if defendant was brought back into officer's unit); People v. Morgan, 112 Ill. 2d 111, 142-144, 492 N.E. 2d 1303, 1316-1317 (1986) (allowing officer's testimony that he investigated an armed robbery and shooting and discovered that defendant had shot two women in his apartment); Hudson, 157 Ill. 2d at 448-453, 626 N.E. 2d at 181-183 (allowing correctional investigator's testimony that another inmate had told him about an escape plan that defendant was involved in and that further investigation corroborated inmate's statement; also allowing other officer's testimony that he investigated three robberies and an aggravated assault and that his investigation resulted in defendant's arrest). Other courts have followed this approach as well. See People v. Aleman, 355 Ill. App. 3d 619, 627, 823 N.E. 2d 1136, 1143 (2005) (allowing hearsay testimony of investigating officer regarding defendant's involvement in armed robbery); Moore, 250 Ill. App. 3d at 918-921,

620 N.E. 2d at 592-594 (allowing hearsay testimony of social worker regarding defendant's sexual contact with child). Thus we conclude that the State may prove up defendant's other criminal activity at sentencing by having the investigating officer testify about what the witnesses told him and about what he learned during his investigation of the other crime. See Perez, 108 Ill. 2d at 85-88, 483 N.E. 2d at 257-259; Morgan, 112 Ill. 2d at 142-144, 492 N.E. 2d at 1316-1317; Hudson, 157 Ill. 2d at 448-453, 626 N.E. 2d at 181-183; Aleman, 355 Ill. App. 3d at 627, 823 N.E. 2d at 1143; Moore, 250 Ill. App. 3d at 918-921, 620 N.E. 2d at 592-594. Any objection to the hearsay nature of that testimony goes to the weight the testimony is to be given, not to admissibility. Jett, 294 Ill. App. 3d at 830, 691 N.E.2d at 152. It is for the trial court, in its sound discretion, to ultimately determine if that testimony is reliable. Jett, 294 Ill. App. 3d at 830, 691 N.E.2d at 152.

In the present case, Detective Walden took the stand and testified regarding his investigation of the three other armed robberies. Walden described the evidence that had been acquired and specifically identified the sources of that evidence, whether it was the statements of the victims, the statements of accomplices, the statements of other officers, or physical evidence that was recovered or processed. As Walden's testimony indicated, the three other robberies all took place around the same time as the instant offense and were similar in circumstance. Walden obtained statements from the victims involved and from one of the subjects who allegedly committed some of the crimes. Walden noted that the statement of the accomplice was consistent with the statements given by the victims. Walden also noted that certain physical evidence, fingerprints, implicated defendant in one of the robberies and that another piece of physical evidence, a surveillance tape, corroborated the victim and accomplice accounts of what had occurred. Walden's testimony was subject to cross examination and the videotaped statements of the accomplice and of another subject involved in one

17

of the robberies were played for the trial judge to consider. Under these circumstances, the trial judge was well within his discretion in determining that the evidence was reliable. See Perez, 108 Ill. 2d at 85-88, 483 N.E. 2d at 257-259; Morgan, 112 Ill. 2d at 142-144, 492 N.E. 2d at 1316-1317; Hudson, 157 Ill. 2d at 448-453, 626 N.E. 2d at 181-183; Aleman, 355 Ill. App. 3d at 627, 823 N.E. 2d at 1143; Moore, 250 Ill. App. 3d at 918-921, 620 N.E. 2d at 592-594. Furthermore, it's clear from the trial judge's comments at sentencing that he did not place undue weight upon Walden's testimony. The trial judge made it clear on the record that he was only sentencing defendant for one armed robbery and that he was only considering Walden's testimony as evidence of defendant's character and motivations.

Defendant's reliance upon our previous case of People v. Kirk, 62 Ill. App. 3d 49, 378 N.E. 2d 795 (1978), is misplaced. Our decision in Kirk stands for the principle that such evidence should be presented in the form of live testimony, rather than from hearsay allegations contained in the presentence report where the information may be vague and the source of the information may be unknown. Kirk, 62 Ill. App. 3d at 54, 378 N.E. 2d at 799. This is a principle which our supreme court has espoused and to which we still adhere. See People v. Jackson, 149 Ill. 2d 540, 548, 599 N.E. 2d 926, 930 (1992); People v. English, 353 Ill. App. 3d 337, 339, 818 N.E. 2d 857, 859 (2004). It is not a principle, however, which compels that the sentence in the present case be vacated.

For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

Affirmed.

JUSTICE HOLDRIDGE, specially concurring:

I concur with the result reached in Justice Carter's opinion. In the spirit of Ockham's razor, however, I write separately to articulate a simpler analysis. Under People v. Bunch, 159 Ill. App.

18

3d 494 (1987), a prosecutor may cross-examine a witness regarding prior juvenile convictions where the witness has opened the proverbial door by giving testimony about some aspect of his criminal record. That is what happened here. Although the policy underlying Harris v. New York, 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971), is instructive by way of comparison, I do not agree with establishing a new Harris-based rule governing impeachment with prior juvenile convictions. In my view, any error that could rightly be remedied under such a rule would also be remediable through Bunch. There is consequently no reason to go beyond the existing law and apply Harris out of its factual context. I would simply affirm the judge's evidentiary ruling under Bunch.

JUSTICE O'BRIEN, dissenting:

Because I do not believe, as the majority apparently does, that in response to this appeal, we should adopt a position "directly contrary to that of other districts of the [Illinois] [A]ppellate [C]ourt" (slip op. at 14), I respectfully dissent from the majority. Applying Illinois law to the instant case, I believe Harris's juvenile record was inadmissable pursuant to the rule adopted in People v. Montgomery, 47 Ill. 2d 510, 268 N.E.2d 695 (1971), and I do not believe his statements on the witness stand were sufficient to "open the door" to the State's use of his juvenile record for impeachment purposes.

As the majority notes, it is well settled in Illinois that a defendant's juvenile criminal history is not admissible in another proceeding against that same defendant. People v. Montgomery, 47 Ill. 2d 510, 517-19, 268 N.E.2d 695, 699-700 (1971). This is true even when the prosecution seeks to use evidence of the defendant's previous juvenile criminal history to impeach the defendant. People v. Kerns, 229 Ill. App. 3d 938, 940, 595 N.E.2d 207, 208 (1992). Moreover, the trial court has no discretion to admit juvenile adjudications for impeachment

19

purposes when the witness is the accused in a criminal case.  Kerns, 229 Ill. App. 3d at 940, 595 N.E.2d at 208.

I am not persuaded by the majority's attempt to deviate from this general rule based on the pronouncements of the United State's Supreme Court in Harris v. New York, 401 U.S. 222, 225-26, 28 L. Ed. 2d 1, 4-5, 91 S. Ct. 643, 645-46 (1971), where the Supreme Court held that a defendant may be impeached at trial by the introduction of prior statements that were obtained in violation of Miranda.  Significantly, the evidence the State sought to use in Harris was not evidence of juvenile adjudications and the evidence was used by the State to directly contradict the defendant's in-court statements. The court in People v. Sturgis, 58 Ill. 2d 211, 216, 317 N.E.2d 545, 548 (1974), in adopting the rational of Harris, narrowly tailored its own holding. The Sturgis court held "the testimony of a defendant or documents voluntarily attested to by him in conjunction with his motion to suppress evidence *** may be used for purposes of impeachment should the defendant choose to testify at trial." Sturgis, 58 Ill. 2d at 216, 317 N.E.2d at 548.  Again, the evidence introduced in Sturgis was not of juvenile adjudications. Sturgis, 58 Ill. 2d at 216, 317 N.E.2d at 548.

The law in Illinois does allow an exception to the general rule that evidence of a defendant's juvenile criminal history is not admissible for the purposes of impeachment. The trial court may admit evidence of a defendant's juvenile criminal record if the defendant "opens the door" by testifying on direct examination to some aspect of his criminal record.  People v. Bunch, 159 Ill. App. 3d 494, 513, 512 N. E.2d 748, 761 (1987).  An exception is recognized where "the witness admits convictions of both admissible and inadmissible kinds under the general rule and affirmatively states that this list of convictions is complete," or the witness

20

affirmatively states on direct examination that he has never been arrested. People v. Brown, 61 Ill. App. 3d 180, 184, 377 N.E.2d 1201, 1203 (1978). Under these circumstances, the prosecutor may then cross-examine the witness regarding any prior arrests or convictions. Brown, 61 Ill. App. 3d at 184, 377 N.E.2d at 1203 .

In the instant case, the State asserts Harris sufficiently opened the door for the admission of his juvenile record by testifying as follows:

> "No Sir. There is no possible way that I could have committed this crime. I mean people who commit robberies, things like that, have a motive, have a reason for doing things like that. But I am a professional man. I work. I go to college. I went to Robert Morris, ICC, Midstate. I mean, it's no reason–I mean I live a productive life. I live just the way any of the 12 jurors, like you live. I don't commit crimes."

The trial court found Harris's statement opened the door to the admission of his adjudication for an offense which occurred in August 2000.

I believe the trial court erred in admitting Harris's juvenile record. I do not believe the trial court was correct in construing Harris's testimony as a discussion of his criminal history. Harris was not making an affirmative reference to his criminal record, nor was he misstating or falsifying his criminal record. His statement "I don't commit crimes," was not in response to any inquiry about his criminal history and as such was not a sufficient statement to "open the door." Harris made only generic, present tense statements regarding living like the jurors, going to school, not committing crimes. This is important to emphasize, especially in light of the fact that

21

the evidence  the State sought to use was the record of Harris's last criminal conviction, a conviction that occurred four years prior to the offense at issue here.

Because this was Harris's third trial on the same charge and the first two trials ended in mistrials, the error committed by the trial court in admitting his juvenile court record cannot be deemed harmless error. See People v. Stechly, 225 Ill. 2d 246, 310, __ N.E.2d __ ( 2007) (stating that a mistrial based on the jury's failure to agree on a verdict was illustrative of the closeness of the evidence).  This was plain error and it was presumptively prejudicial to Harris since his previous two trials, conducted without the use of his juvenile record (but in all other respects substantially identical), ended in mistrial.

Therefore, I respectfully dissent. I believe Harris's conviction should be reversed and this matter remanded to the trial court for further proceedings.

Because I believe the trial court should be reversed, I do not believe we should reach the argument of whether Harris's sentence was excessive.